**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 23-cv-23497-BLOOM/Torres**

JANE DOE,

      Plaintiff,

v.

MIAMI GARDENS SQUARE ONE, INC.,
*individually and d/b/a* TOOTSIE'S
CABARET MIAMI,

      Defendant.

_____/

**<u>ORDER DENYING DEFENDANT'S MOTION TO DISMISS</u>**

    **THIS CAUSE** is before the Court upon the Defendant's Motion to Dismiss, ECF No. [22],

filed on January 9, 2024. Plaintiff filed a Response, ECF No. [27], to which Defendant filed a

Reply, ECF No. [28]. The Court has reviewed the Motions, the record in the case, and is otherwise

fully advised. For the reasons stated below, Defendant's Motion to Dismiss is denied.

    **I.**    **BACKGROUND**

    In her Amended Complaint, Plaintiff Jane Doe[1] asserts 15 claims: Gender Discrimination-

Hostile Work Environment under Title VII, 42 U.S.C. § 2000e-2(a) (Count I); Retaliation under

Title VII, 42 U.S.C. § 2000e-3(a) (Count II); Gender Discrimination-Hostile Work Environment

under the Florida Civil Rights Act ("FCRA") § 760.10(1)(a) (Count III); Retaliatory Hostile Work

Environment under FCRA § 760.10(7) (Count IV); Retaliation under FCRA § 760.10(7) (Count

V); Gender Discrimination-Hostile Work Environment under Miami-Dade County Code of

Ordinances ("MDCO"), Chapter 11A, Article IV, Section 26(1) (Count VI); Retaliatory Hostile

---

[1] Plaintiff alleges she is a sexual assault victim and, accordingly, is identified as Jane Doe.

Work Environment under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VII); Retaliation

under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VIII); Sex Trafficking by Force

and/or Coercion under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18

U.S.C. § 1591 (Count IX); Participating in a Venture under the TVPRA, 18 U.S.C. § 1591 (Count

X); Negligence (Count XI); Negligent Training (Count XII); Intentional Infliction of Emotional

Distress (Count XIII); Negligent Infliction of Emotional Distress (Count XIV); and Vicarious

Liability for Sexual Assault and Battery (Count XV). *See generally* ECF No. [13].

Plaintiff alleges the following: she was employed as an entertainer at a club owned by

Defendant Miami Gardens Square One, Inc., doing business as Tootsie's Cabaret Miami ("Club"),

from May 21, 2022 to June 20, 2022. ECF No. [13] ¶¶ 30, 69. Defendant maintained complete

control over Plaintiff's employment as an entertainer. *Id.* at ¶ 24 As part of her employment,

Plaintiff would receive compensation in accordance with the pay structure set by Defendant, and

she was unable to negotiate or adjust her pay structure. *Id.* at ¶ 26. Plaintiff completed new hire

paperwork. *Id.* at ¶ 31. Plaintiff had to be at Defendant's Club in order to perform her job and

utilized the stage and private VIP rooms under the direct supervision of Defendant's management

team. *Id.* at ¶ 27. Plaintiff believed she was working under the direction and supervision of

Defendant. *Id.* at ¶ 28.

The Club included a public area where entertainers perform as well as private VIP rooms,

where patrons could be alone with entertainers as they danced. *Id.* at ¶ 46. Each VIP room was

completely isolated with a closing door and/or curtain, several couches, a stage with a pole, coffee

tables, and televisions. *Id.* at ¶ 33. The VIP rooms were upstairs, secluded from the rest of the

Club. *Id.* Outside the VIP rooms were on average two to three men working the "Dance Track"

outside. *Id.* at ¶ 34. The men were responsible for collecting payment on behalf of the Defendant

for each of the VIP rooms and chauffeuring the entertainers and the patrons to the empty rooms. *Id.*

Following the completion of her paperwork, one of the Club managers, Fernando Otero took Plaintiff on a tour of the property. *Id.* at ¶ 31. During the tour, Otero guided Plaintiff to the VIP rooms, and informed her that there were no cameras in any of the VIP rooms. *Id.* at ¶ 32. Additionally, Otero pointed to a stack of napkins and trashcans, and said "take care of business when up here." *Id.* at ¶¶ 32, 90. Plaintiff was advised by many of the entertainers that, should she need it, there were always condoms under the trashcans in the VIP rooms. *Id.* at ¶ 44. Plaintiff alleges that "the location and solitude of the upstairs VIP rooms cultivated an environment wherein the women were routinely engaging in sexual activity with clients for profit under the guise of tip sharing with their managers." *Id.* Plaintiff witnessed such an exchange during her first week at the Club, and observed a female entertainer provide a male manager an estimated two-thousand dollars in cash, after which he proceeded to kiss the entertainer on the forehead and said "thank you baby." *Id.* at ¶ 43.

One week into Plaintiff's employment, one of Defendant's managers, Robert Lopez, asked Plaintiff her age. *Id.* at ¶¶ 35, 37. When she advised she was only 19, Lopez told her "oh you're just a baby. You're so sexy." *Id.* at ¶ 37. That same evening, he proceeded to call and text her around 3:00 am. *Id.* at ¶ 38. That same night, he asked Plaintiff whether she was interested in doing "extras" and added: "I'd spend a pretty penny on you." *Id.* at ¶ 40. Plaintiff responded "no, I don't do all that." *Id.*

During the course of her employment, Plaintiff was sexually assaulted twice within the span of five days. *Id.* at ¶¶ 30-69. The first incident occurred in a VIP room involving a patron from Defendant's Club. *Id.* at ¶¶ 46-58. The Club patron raped Plaintiff in the VIP room and violently penetrated Plaintiff's vagina against her will. *Id.* at ¶¶ 49-54. When Plaintiff screamed

for help, the patron muffled her screams by applying his hands on Plaintiff's face with such force she believed her nose would be broken. *Id.* at ¶ 52. Despite Defendant's assurances that it had security guards, Plaintiff was left alone to fend off her attacker. *Id.*

When Plaintiff returned to work five days later, a second incident took place involving a different Club patron. *Id.* at ¶¶ 60-61. On June 20, 2022, Plaintiff was giving that patron a lap dance in the main room when he proceeded to forcibly insert his fingers into her vagina. *Id.* at ¶ 61. Another employee noticed this take place. *Id.* As Plaintiff was crying, the patron was removed from the property. *Id. A* few hours later, the patron reappeared and attempted to sexually fondle Plaintiff for a second time. *Id.* at ¶¶ 61-62. Plaintiff fled to the dressing room, when she was called to the stage to perform. *Id.* Nearly throwing up, she advised the DJ that she could not perform that evening and returned to the dressing room. *Id.* at ¶ 64. Plaintiff then went to Otero's office, the manager on duty that day, and told him what had occurred with the Club patron, who was still inside the Club. *Id.* at ¶ 65. Otero seemed upset and told her: "He fingered you twice? Why didn't you stop him?" *Id.* at ¶ 66. Plaintiff told Otero she needed to leave her shift early and he agreed. *Id.* Plaintiff walked off the property alone and without a security guard to walk her to her car. *Id.* at ¶ 68.

Defendant seeks to dismiss eight counts of Plaintiff's Amended Complaint for failure to state a claim upon which relief could be granted under Fed. R. Civ. P. 12(b)(6).[2] Defendant

---

[2] Though Defendant claims to challenge the Complaint on all counts, it only raises challenges to the following eight counts: Gender Discrimination-Hostile Work Environment under Title VII, 42 U.S.C. § 2000e-2(a) (Count I); Retaliation under Title VII, 42 U.S.C. § 2000e-3(a) (Count II); Gender Discrimination-Hostile Work Environment under the Florida Civil Rights Act ("FCRA") § 760.10(1)(a) (Count III); Retaliation under FCRA § 760.10(7) (Count V); Gender Discrimination-Hostile Work Environment under Miami-Dade County Ordinance ("MDCO"), Chapter 11A, Article IV, Section 26(1) (Count VI); Retaliation under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VIII); Sex Trafficking by Force and/or Coercion under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 (Count IX); Participating in a Venture under the TVPRA, 18 U.S.C. § 1591 (Count X). Defendant does not challenge the sufficiency of Plaintiff's allegations as to Retaliatory Hostile Work Environment under FCRA § 760.10(7) (Count IV); Retaliatory Hostile Work Environment under MDCO,

contends that (1) Plaintiff fails to plausibly plead her employment status; (2) Plaintiff fails to adequately plead a claim against the Defendant for creating a hostile work environment; (3) Plaintiff fails to adequately plead a claim against Defendant for Retaliation; (4) Plaintiff's claims under the FCRA and the MDCO fail for the same reasons the Title VII claims fail; (5) Plaintiff fails to adequately plead a claim against Defendant for participating in a venture or for sex trafficking by force and/or coercion under the TVPRA; and (6) the Court should dismiss Plaintiff's state law claims if Plaintiff's federal claims are dismissed. *See generally* ECF Nos. [22], [28].

## II.   LEGAL STANDARD

"On a Rule 12(b)(6) motion to dismiss, '[t]he moving party bears the burden to show that the complaint should be dismissed.'" *Sprint Sols., Inc. v. Fils–Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (quoting *Mendez–Arriola v. White Wilson Med. Ctr. PA*, No. 09–495, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010)). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). A complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

---

Chapter 11A, Article IV, Section 26(4) (Count VII); Negligence (Count XI); Negligent Training (Count XII); Intentional Infliction of Emotional Distress (Count XIII); Negligent Infliction of Emotional Distress (Count XIV); and Vicarious Liability for Sexual Assault and Battery (Count XV).

"To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. As a general rule, when reviewing a motion to dismiss, a Court must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). Although the Court is required to accept all of the factual allegations as true, this tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. In considering a Rule 12(b) motion to dismiss, the court is limited to the facts contained in the complaint and attached exhibits. *See Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006).

## III.  DISCUSSION

### A.  Discrimination and Retaliation Claims under Title VII, the FCRA and the MDCO

#### i.      Gender Discrimination – Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To determine whether Title VII applies, a court must first determine the plaintiff's employment status. This is because "[t]he protection against sex discrimination provided by Title VII extends only to employees and is not afforded to independent contractors." *Taylor v. BP Exp., Inc.*, 2008 WL 5046071, at *3 (S.D. Ga. 2008). Title VII defines "employee" to mean "an individual employed by an employer...." 42 U.S.C. § 2000e(f). Congress intended the term "employee" to be interpreted according to its common, everyday meaning. *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir. 1982) (citing to *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618 (1944)).

If the plaintiff is an employee, then the question becomes whether the plaintiff has adequately established the elements of her Title VII claims — here, the elements of a gender discrimination claim based on a hostile work environment. "While Title VII does not explicitly reference sexual harassment, the Supreme Court has recognized a violation when 'discrimination based on sex has created a hostile or abusive work environment.'" *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 707-08 (11th Cir. 2020) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). Specifically, a court must determine whether "the conduct alleged …. created a hostile work environment that exposed [the plaintiff] to disadvantageous terms or conditions of employment to which members of the other sex were not exposed." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citation omitted). "[T]he evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Id*. at 808. To prove a hostile work environment, the plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Id.*; *see also Arnold v. Heartland Dental, LLC*, 101 F. Supp. 3d 1220, 1225 (M.D. Fla. 2015) (same elements for FCRA claims).

The anti-discrimination provisions of the FCRA[3] and MDCO[4] are nearly identical to Title VII and are construed similarly. For claims brought under the FCRA, Florida courts turn to decisions interpreting Title VII because the "Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *see also Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000). MDCO claims are also interpreted accordingly to their federal counterparts. *See Telesca v. Vill. Of Kings Creek Condo. Ass'n, Inc.,* 390 F. App'x 877, 879 n. 1 (11th Cir. 2010) (in the context of the Fair Housing Act).

The Court first turns to the question of whether Plaintiff adequately alleged her employment status, and then turns to whether she adequately alleged the elements of her hostile work environment claims.

### a.      Plaintiff's Employment Status

Defendant contends that Plaintiff fails to sufficiently allege that she is an employee of Defendant under the hybrid approach set forth in *Bolton*. ECF No. [22] at 5; *see Bolton v. Rock N Massage, Inc.*, No. 19-CV-60008, 2019 WL 1296872, at *2 (S.D. Fla. Mar. 21, 2019). Plaintiff responds that she is an employee under the hybrid approach and can therefore bring her claims under Title VII, the FCRA, and the MDCO. ECF No. [27] at 7. Both parties assert that the Court

---

[3] Under Florida Statutes § 760.10(1),
"[i]t is an unlawful employment practice for an employer: (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."
Fla. Stat. § 760.10(1).

[4] Under MDCO 11A-26(1)(a),
"[i]t shall be unlawful for any employer to engage in any practices described below on account of the race, color, religion, ancestry, sex, pregnancy, national origin, age, disability, marital status, familial status, gender identity, gender expression, sexual orientation, or actual or perceived status as a victim of domestic violence, dating violence or stalking of any individual or any person associated with such individual: … to otherwise discriminate against any individual[.]"
MDCO, ch. 11A, art. IV, § 26(1)(a).

should apply a "hybrid approach" to determine whether Plaintiff is an employee, which considers the economic realities of the hired party's dependence on the hiring party and the right of the employer to control the employee. ECF No. [22] at 5-6; ECF No. [27] at 4-6. Plaintiff asserts that "[a] person's employee status under Title VII is a question of federal law that is properly decided by the Court at the summary judgment stage of litigation," because the economic realities test requires a factual analysis. *Id.* at 5-6; *see Taylor*, 2008 WL 5046071, at *3. Defendant replies that the Equal Employment Opportunity Commission ("EEOC") already determined in its Dismissal and Notice of Rights that it had no jurisdiction over Plaintiff's claims because there was no employment relationship. ECF No. [22] at 6.

The Court first considers whether Plaintiff has sufficiently alleged that she was an employee of Defendant's Club. EEOC determinations and findings of fact are not binding on the trier of fact, therefore the Court must determine the nature of employment relationship between the parties. *See Moore v. Devine,* 767 F.2d 1541, 1551 (11th Cir. 1985). To establish whether Plaintiff is an employee, courts must follow a hybrid approach:

> [I]n the context of federal employment discrimination statutes, such as Title VII and the ADEA, a hybrid approach applies. *Id.* "Under the hybrid approach, [a court] look[s] at the common-law agency test, tempered by a consideration of the economic realities of the hired party's dependence on the hiring party." *Id.* (quotations and citations omitted); *see also Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir. 1982).

*Bolton*, 2019 WL 1296872, at *2.

The Eleventh Circuit has explained that because there is "no indication that Congress intended the words of the statute to have anything but their ordinary meaning as commonly understood," the term "employee . . . is to be construed in light of general common law concepts" considering the "economic realities of the relationship." *Cobb*, 673 F.2d at 340-41. "[I]t is the

economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative." *Id.* at 341.

A Court should review the following eleven factors to determine whether the economic realities of the work relationship establish that one is an employee:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Cobb*, 673 F.2d at 340 (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 832 (7th Cir. 1981)). In addition, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). The employer's right to control "the means and manner of the worker's performance is the most important factor to review...." *Cobb*, 673 F.2d at 340. "If the employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* (quoting *Spirides*, 613 F.2d at 831-32).

When applying the hybrid approach, courts separately consider: (1) the eleven factors cited above, and (2) the employer's right to control the employee. *See Cuddeback v. Fla. Bd. Of Educ.*, 381 F.3d 1230 (11th Cir. 2004); *see Taylor*, 2008 WL 5046071, at *3; *see also Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368 (M.D. Ga. 2005). The Court follows this approach here. However, the Court notes that these cases were considered in a summary judgment posture. In contrast, the

Court is required to consider whether Plaintiff has sufficiently alleged her employment status on a motion to dismiss. A pleading must only contain "short and plain" statements of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *see Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678. Accordingly, the Court merely considers whether the facts in Plaintiff's Amended Complaint, taken as true, are sufficient to plausibly state a claim that Plaintiff is an employee under a hybrid approach.

### 1. Common Law Principles of Agency and Economic Realities of the Hired Party

The Court first turns to the eleven factors, laid out above, to determine whether the economic realities of the employment relationship weigh in favor of finding that Plaintiff is an employee of Defendant.

### a. Type of Work Performed

The first factor considers whether Plaintiff performed the type of work usually done "under the direction of a supervisor or [wa]s done by a specialist without supervision." *Cobb*, 673 F.2d at 340. In *Taylor v. BP Express*, the plaintiff worked as a driver for the defendant. 2008 WL 5046071, at *3. The plaintiff received little to no supervision for her work. *Id.* The plaintiff's supervisor provided her with the appropriate documents and pin numbers to make her hauls but "did not oversee the details of her job performance in making the hauling trips." *Id.* The Eleventh Circuit held that "[t]his kind of interaction, in which the supervisor does not actually supervise how the work is to be done, but is solely interested in the fact that the work is completed, is 'typical' of how an employer might deal with an independent contractor." *Id.* at *4*; *see Cobb*, 673 F.2d at 342.

Here, however, Plaintiff alleges that she was under direct supervision of Defendant's management team while she performed her job. ECF No. [13] ¶¶ 27-28. Otero asserted supervisory authority over Plaintiff and had operational control over Plaintiff, including the ability to hire, fire,

adjust hours, and reprimand Plaintiff. *Id.* at ¶¶ 27-31. Defendant's management team instructed Plaintiff to complete her new hire paperwork. *Id.* at ¶ 30. Defendant required that "all employees, including Plaintiff, report directly to Lopez and/or Otero as to the operation and function of their job." *Id.* at ¶ 286. Further evidencing Defendant's ability to supervise Plaintiff, Plaintiff reported her second sexual assault to Otero and sought his permission to leave her shift early. *Id.* at ¶ 66. Plaintiff has set forth allegations that support this factor and weigh in favor of Plaintiff's employee status.

### b. Skill Required

The second factor considers the skill required for the relevant occupation. In *Taylor*, the plaintiff's job required a specific skill: operating a truck. *See Taylor*, 2008 WL 5046071, at *4. There, the court found that the "considerable skill and licensing requirements" indicated the plaintiff was an independent contractor. *Id.* Here, Plaintiff alleges that she provided her entertainment skills to Defendant's Club. ECF No. [13] ¶ 28. Plaintiff alleges that she had told Defendant's manager, Christian, that she had previously worked at another cabaret. *Id* at ¶ 23. Without requiring her to audition, Christian offered Plaintiff employment as an entertainer. *Id.* Plaintiff's dancing and entertainment skills weigh in favor of finding an employee status.

### c. Equipment Furnished and Place of Work

Regarding this third factor, to perform her job Plaintiff was required to be at Defendant's place of business utilizing their stage and private rooms. *Id.* at ¶ 27. In *Taylor*, the plaintiff provided her own truck, the equipment necessary to perform the work, and had to pay for all expenses associated with the truck such as fuel, oil, and maintenance. 2008 WL 5046071, at *4. There, the court found the plaintiff to be an independent contractor. *See id.* at *4. Here, Plaintiff has set forth allegations that the Defendant provided the equipment and place of work. This factor weighs in favor of Plaintiff's employee status.

### d. Length of Employment

The fourth factor requires reviewing the length of time during which Plaintiff has worked; the longer the working relationship, the more likely the individual is an employee. *See Taylor*, 2008 WL 5046071, at *4; *Lockett*, 364 F. Supp. 2d at 1375. In *Taylor*, where the plaintiff worked for the defendant for a period of seven weeks, the short duration weighed in favor of the plaintiff being an independent contractor. 2008 WL 5046071, at *4. Here, Defendant employed Plaintiff from May 21, 2022 to June 20, 2022, establishing a short duration. ECF No. [13] ¶¶ 30-69; *see Taylor*, 2008 WL 5046071, at *4. However, Plaintiff alleges she terminated her position due to rape and sexual assault. As such, the Court declines to weigh this factor against Plaintiff's employee status at this stage.

### e.   Method of Payment

The fifth factor examines the method of payment of the party, namely whether Plaintiff was paid by time worked or by job completed. Plaintiff alleges in her Amended Complaint that "[a]s part of her employment, Ms. Doe would only receive compensation in accordance with the pay structure as set by Defendant TOOTSIES. Ms. Doe was not able to negotiate or adjust her payment structure." ECF No. [13] ¶ 26. Plaintiff alleges that Defendant provided her "financial/employment compensation in the form of tips from paying Patrons." *Id.* at ¶ 284. Before Plaintiff proceeded to a VIP room with a Patron, the patron paid the Defendant's employee on shift working the dance track. *Id.* at ¶ 48. Plaintiff states that "[e]ntertainers receive their respective 'share' of profits from the 'sale' of the room and any 'house fee' required to be paid by the Entertainers to the Defendant." *Id.* at ¶ 293. Like in *Taylor*, where the plaintiff was paid per trip, as opposed to by hour, the court considers this factor as weighing in favor of an independent contractor determination. *See Taylor*, 2008 WL 5046071, at *4.

### f.   Termination of Work Relationship

The sixth factor considers the manner in which the work relationship is terminated; either party can terminate the agreement, giving the Defendant no greater authority to fire the Plaintiff than the Plaintiff has to resign. *See Lockett*, 364 F. Supp. 2d at 1374. In *Taylor*, where both the defendant and "the plaintiff had the ability to terminate the working relationship" because it was expressed in the lease agreement, the court found this indicated that the plaintiff was an independent contractor. *Taylor*, 2008 WL 5046071, at \*4. Here, Plaintiff told Defendant's manager that she needed to leave her shift early, to which he agreed. ECF No. [13] ¶ 66.  She subsequently resigned. *Id.* Plaintiff does not sufficiently detail in her Amended Complaint the manner of her resignation. The Court cannot infer whether this factor weighs in favor of an employee status or in favor of an independent contractor status.

### g.   Annual Leave

Plaintiff's Amended Complaint is silent as to the seventh factor, which asks whether Plaintiff received annual leave.

### h.   Integral Part of Business

The eighth factor asks whether the work is an integral part of Defendant's business. Plaintiff alleges that her work as an entertainer is an integral part of the Club's business model. *Id.* at ¶ 285. Plaintiff adds that according to Defendant, "they own and operate the 'Largest Strip Club in the World,' and offering its[] customers '2 levels of fun' across 'VIP luxury suites, 6 stages and 6 bars,'" which entails that without Plaintiff and her co-entertainers serving as dancers there would be no purpose to the business. *Id.* at ¶ 283. In *Taylor*, the court acknowledged that if the work is an integral part of the business, then this factor weighs in favor of an employee classification. *See Taylor*, 2008 WL 5046071, at \*5. Here, Plaintiff has set forth allegations in support of this factor, which weighs in favor of her employee status.

14

### i.  Benefits

Plaintiff's Amended Complaint is silent as to the ninth factor, which asks whether Plaintiff accumulated retirement benefits.

### j.  Taxes Paid

Plaintiff's Amended Complaint is silent as to the tenth factor, which asks whether Defendant pays social security taxes.

### k.  Intention of the Parties

The eleventh factor asks the Court to consider the intention of the parties. In *Taylor*, the court found that the terms of the parties' agreement served as a manifestation of the parties' intent. 2008 WL 5046071, at *5. Here, Plaintiff states in her Amended Complaint that Defendant's management team instructed Plaintiff to complete her new hire paperwork, which supports the contention that parties agreed to hire Plaintiff as an employee. ECF No. [13] ¶ 30; *see Taylor*, 2008 WL 5046071, at *5. This allegation supports the conclusion that Plaintiff is an employee.

Plaintiff has set forth sufficient allegations to satisfy five of the eleven factors above and plausibly claim that she is an "employee . . . [as] construed in light of general common law concepts" considering the "economic realities of the relationship." *Cobb*, 673 F.2d at 340-41.

### 2. Right of the Employer to Control the Employee

The Court next considers whether Defendant asserted a right to control "the means and manner of the worker's performance[,]" which "is the most important factor to review...." *Cobb*, 673 F.2d at 340. Plaintiff alleges that Defendant employed "men working on the 'Dance Track'" who were responsible for collecting payment for each VIP room and chauffeuring the entertainers and the patrons to the empty rooms. ECF No. [13] ¶ 34. Plaintiff alleges she was introduced by Defendant's Management team to a new patron who was interested in the VIP rooms, who ended up raping her. *Id.* at ¶ 46. Plaintiff additionally sought the permission of one of her managers,

Otero, to leave early after being sexually assaulted. *Id.* at ¶ 66. Plaintiff has set forth sufficient allegations that Defendant asserted a right to control "the means and manner of the worker's performance[.]" *Cobb,* 673 F.2d at 340.

Accordingly, Plaintiff has sufficiently alleged her employment status under Title VII, the FCRA, and the MDCO. The Court next turns to whether Plaintiff has alleged the elements of her gender discrimination (hostile work environment) claims.

### b.      Hostile Work Environment Claim

Plaintiff alleges three counts of Gender Discrimination: Count I for Gender Discrimination under Title VII (Hostile Work Environment); Count III for Gender Discrimination (Hostile Work Environment) under the FCRA § 760.10(1)(a); and Count VI for Gender Discrimination (Hostile Work Environment) under the MDCO, Chapter 11A, Article IV, Section 26(1). Plaintiff alleges the following facts: she was "forced to endure regular sexual advances, pressure, and solicitation by her managers/Supervisors. Lopez, Defendant's Manager … would make sexual passes at Plaintiff, comment on he[r] appearance, call and text her at inappropriate times/hours, call her sexy, ogle her body, and even so much as offer to pay a 'pretty penny' to have sex with her." ECF No. [13] ¶ 145. In addition, both of her managers Lopez and Otero suggested that she engage in sex for money on the premises. Otero noted the "alternate use" of the VIP rooms, "pointing out napkins and trashcans to 'take care of business when up [there].'" *Id.* at ¶ 146. Plaintiff was later informed that there were in fact condoms stored under the trashcan. *Id.* Lopez asked Plaintiff if she would do "extras." *Id.* at ¶ 147. As detailed in the Amended Complaint, Plaintiff was forcibly raped in the VIP room, *Id.* at ¶ 149, and no security guard came to rescue her when she screamed for help in the isolated, camera-less upstairs VIP rooms. Five days later, she was sexually assaulted by a patron in the main room of the business. *Id.* at ¶ 150. Despite Plaintiff reporting the behavior to Otero, he only blamed her for the interaction. *Id.* at ¶ 151.

Defendant argues that Plaintiff does not allege facts that support a plausible claim as to the fourth element of a hostile work environment claim under all three counts because she fails to satisfy the fourth element of a hostile work environment claim: she does not allege harassment sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. ECF No. [22] at 8. Defendant contends that the conduct regarding Lopez was not frequent or severe and did not interfere with Plaintiff's conduct, as required under *Allen*, 799 F. App'x at 708. ECF No. [22] at 9. Defendant asserts the allegations of patron misconduct do not establish that Defendant created a hostile work environment. *Id.* at 10-11. Plaintiff responds that Defendant created an "unbearable and humiliating sexually harassing and hostile work environment, culminating in Plaintiff being raped." ECF No. [27] at 8. Regarding the patron harassment, Plaintiff cites *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073-74 (10th Cir. 1998) for its proposition that "an employer may be found liable for the harassing conduct of its customers," since the "employer ultimately controls the conditions of the work environment." *Id.* at 12.

> To establish a hostile work environment claim, a plaintiff must show:
>
> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Mejdoub v. Desjardins Bank, N.A.*, No. 14-CIV-62722, 2016 WL 4369968, at *8 (S.D. Fla. Jan. 11, 2016) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). Defendant does not dispute that Plaintiff has adequately alleged the first, second, third, and fifth element and only challenges the sufficiency of the fourth element of Plaintiff's hostile work environment claim. Accordingly, the Court considers whether Plaintiff sufficiently alleged that the

harassment sufficiently severe or pervasive to alter the terms and conditions of employment and created a discriminatorily abusive working environment. *Reeves*, 594 F.3d at 808.

To determine the objective severity of the harassment under the fourth element, courts have looked to the totality of the circumstances including: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Reeves*, 594 F.3d at 808; *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Forklift Sys., Inc.*, 510 U.S. at 21). "Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." *Reeves*, 594 F.3d at 808. Under the fourth element, "to be sufficiently 'severe or pervasive,' the employer's actions 'must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s]… to be abusive.'" *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 837 (11th Cir. 2021) (quoting *Miller*, 277 F.3d at 1276).

The Court examines whether Plaintiff has alleged a harassment "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment[.]"   *Reeves*, 594 F.3d at 808. Defendant separates the patrons' and the managers' misconduct to argue that neither rise to the requisite level of severity or pervasiveness to "alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Id.* at 808; ECF No. [22] at 8. However, the Court sees no basis to separate the manager's misconduct from patrons' misconduct when considering whether Plaintiff alleged sufficiently severe or pervasive harassment. First, "an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). Second, "[i]t is well established that employers may be

liable for failing to remedy the harassment of employees by third parties who create a hostile work environment." *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957 (11th Cir. 2010). More specifically, "[a]n employer may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." *Watson v. Blue Circle, Inc.* 324 F.3d 1252, 1258 n. 2 (11th Cir. 2003).

In *Watson*, the Eleventh Circuit declined to separate plaintiff's allegations against her coworkers and against Defendant's customers, finding that "both collectively constitute an allegation of a single unlawful employment practice." *Id.* Though *Watson* was analyzing whether there was a basis for holding the employer liable under the fifth element for hostile work environment sexual harassment, the Court follows its example and considers the severity or pervasiveness of the allegations regarding the Defendant's managers' and the patrons' misconduct jointly.

Addressing the work environment, Plaintiff has provided sufficient facts to state a claim for relief against Defendant for creating a hostile work environment under Title VII, the FCRA, and the MDCO. Plaintiff has satisfied the first element demonstrating the objective severity of the harassment: the frequency of the conduct. She has alleged she was sexually harassed and assaulted on multiple occasions in less than a month, from May 21, 2022 to June 20, 2022: (1) Plaintiff was forced to endure sexual advances, pressure, and solicitation by her manager Lopez; (2) on June 15, 2022 Plaintiff was raped by a male patron in the VIP room; (3) on June 20, 2022, Plaintiff was sexually assaulted by a Patron, who remained present on the premises. ECF No. [13] ¶¶ 86-94.

Plaintiff also satisfied the second element: the severity of the conduct. Plaintiff alleged severe sexual harassment, including forcible rape by the Defendant's patron in the VIP room— Plaintiff yelled for help from the VIP room, noticed her vagina was bleeding, and had visible

19

bruises and wounds. *Id.* at ¶¶ 50-58; 93. The assault by the second patron, the forcible insertion of a Patron's fingers into Plaintiff's vagina, is a similarly severe allegation of sexual harassment. *Id.* at ¶ 61.

Those allegations similarly satisfy the third element: whether the conduct is physically threatening or humiliating, as opposed to a mere offensive utterance. There is little question that Plaintiff's allegations of a forcible rape in the VIP room by one patron and her sexual assault in the Main Room of the business by a second patron, who was not removed from the premises, set forth a physically threatening environment. *Id.* at ¶¶ 93-94.

Finally, Plaintiff has satisfied the fourth element: whether the conduct unreasonably interferes with the employee's job performance. After a patron sexually assaulted Plaintiff in the Main Room, was not removed, and proceeded to subsequently fondle her, Plaintiff was unable to pursue her usual job duties. *Id.* at ¶¶ 61, 64. When the DJ called Plaintiff's name for her to return to the stage, she told the DJ she could not perform that evening. *Id.* Then, Plaintiff explained to Otero the incident that occurred, told him that she needed to leave her shift early, and he agreed. *Id.* at ¶ 66.

Plaintiff has sufficiently alleged a harassment "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment[.]" *Reeves*, 594 F.3d at 808. She has alleged an environment that a "reasonable person would find hostile or abusive" as well as an environment that she "subjectively perceive[d]… to be abusive.'" *Tonkyro*, 995 F.3d at 837.

Plaintiff has alleged significantly more severe harassment than that rejected by the Eleventh Circuit in *Allen*, *Gupta*, *Mendoza* and *Harris*. In *Allen*, the plaintiff's supervisor had made five isolated comments to plaintiff in the span of four months. *Allen*, 799 F. App'x at 708–09. The Eleventh Circuit explained that "[t]hese sporadic comments, spread over four months, can

hardly be described as frequent. Further, the comments appear to have been said in a joking manner, and in the overarching context of [plaintiff] being friendly with Santos (or working out together in a gym)." *Id.* The conduct alleged by the plaintiff in *Allen* was less intrusive than that alleged by Plaintiff in this action. *Allen* is therefore inapposite. In *Gupta*, the conduct alleged similarly lacked severity, as the plaintiff "cannot establish her hostile environment claim with allegations that [another employee] stared at her twice, touched her ring and bracelet once, and kept asking her to lunch." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585 (11th Cir. 2000), *overruled on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008). Nor was the conduct in *Mendoza* as severe or pervasive as Plaintiff's allegations in this case, where the plaintiff's supervisor had engaged in "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of Page's making a sniffing sound" as well as "'constant' following and staring." *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1249 (11th Cir. 1999).

Defendant relies on *Harris v. Pub. Health Tr. Of Miami-Dade Cnty.*, 82 F.4th 1296, 1305 (11th Cir. 2023) to support its argument that there is "no reasonable inference that the…conduct…unreasonably interfered with [Plaintiff's] job performance." However, that reliance is similarly misplaced. There, the plaintiff's supervisor had made a "slur about black employees' poor work ethic [which] was ignorant and extremely demeaning." *Harris*, 82 F.4th at 1305. The Court found that the comment "was isolated, it wasn't directed specifically at [plaintiff], and it wasn't as severe as the remarks that courts have found created hostile environments." *Id.* Under the totality of the circumstances, the conduct was not "particularly frequent, physically threatening, or humiliating [n]or . . . unreasonably interfered with Harris's job performance" *Id.* The isolated comments or physical contact at issue in *Allen*, *Gupta*, *Mendoza* and *Harris* differ significantly, in severity or frequency, from the physical assaults and commercial sex proposition

at issue in this case. To be sure, "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment." *Reeves*, 594 F.3d at 807. However, where Plaintiff has alleged two forcible sexual assaults, and a proposition for commercial sex by her manager, she has sufficiently alleged a hostile work environment under Title VII.[5]

Plaintiff has plausibly alleged a claim for a hostile work environment. Accordingly, Defendant's Motion to Dismiss is denied as to Plaintiff's claims arising under Title VII, FCRA, and MDCO for a hostile work environment.

### ii.    Retaliation Claim

Plaintiff alleges three counts of Retaliation: Count II for Retaliation under 42 U.S.C. § 2000e-3(a) of Title VII, Count V for Retaliation under the FCRA § 760.10(7) and Count VIII for retaliation under the MDCO, Chapter 11A, Article IV, Section 26(4). Plaintiff alleges the following facts as to Defendant's retaliation: Plaintiff engaged in protected activity when she opposed and reported the conduct of patrons to Defendant's managers, as well as when she "routinely rebuffed and refused both the sexual advances of her boss, Mr. Lopez, as well as refused to engage in a 'sex-for-cash' schemed being run by Defendant Tootsie's management team." ECF No. [13] ¶¶ 111, 113. Plaintiff alleges this informal complaint or protest constitutes protected activity and dissuades a reasonable worker from making or supporting a charge of discrimination. Accordingly, Plaintiff was constructively discharged as she was left with no alternative but to

---

[5] The fact that the conduct occurred at a strip club does not change the analysis here, contrary to Defendant's contention. *See* ECF No. [28] at 3-4. As explained by an in-circuit district court, a plaintiff's "decision to work as an entertainer at a strip club does not mean that she agreed to submit to sexual activity with customers..." *Valente v. Int'l Follies, Inc.*, No. 1:16-CV-1138-ELR-JSA, 2018 WL 11485270, at *28 (N.D. Ga. July 10, 2018), *report and recommendation adopted*, No. 1:16-CV-1138-ELR, 2018 WL 11485272 (N.D. Ga. Sept. 21, 2018).

resign. *Id.* at ¶ 120.

Defendant argues the following: Plaintiff failed to sufficiently allege two elements of a retaliation claim under Title VII (Count II), the FCRA (Count V) and the MDCO (Count VIII): first, she failed to establish that she suffered an adverse employment action. Second, she failed to establish there was a causal connection (a but-for cause) between the protected activity and the adverse employment action. ECF No. [22] at 12. Plaintiff's resignation did not give Defendant the opportunity to retaliate against her. *Id.* at 12-13. That Defendant failed to take corrective action after being informed of the sexual assault retaliation is not sufficient to constitute an adverse employment action under *Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 150 (11th Cir. 2021). ECF No. [22] at 12-13. Plaintiff fails to rebut Defendant's argument on the retaliation count. *See generally* ECF No. [27].

Title VII makes it an unlawful employment practice:

> for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000 e-3(a). To state a claim for retaliation under Title VII, Plaintiff must prove the following elements: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Jenkins v. Miami Dade Cnty.*, No. 22-CV-23910, 2023 WL 5455396, at *3 (S.D. Fla. Aug. 24, 2023) (quoting *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008)). "[M]istreatment based on retaliation for protected conduct—for example, making or supporting a charge of discrimination—is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Monaghan v.*

*Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (citation omitted); *see also Crawford*, 529 F.3d at 974.

Defendant does not contest that Plaintiff sufficiently alleged she engaged in protected activity. Accordingly, the Court does not reach the first element of the retaliation claim: whether Plaintiff established that she engaged in an activity protected under Title VII when she resisted Lopez's advances and Defendant's managers' pressure to engage in commercial sex with patrons. Defendant only argues that Plaintiff failed to plead the second and third elements of a claim for retaliation under Title VII. Accordingly, the Court only considers whether Plaintiff has adequately alleged that she suffered an adverse employment action under the second element, and that there was a causal connection between the protected activity and the adverse employment action under the third element.

The Court first turns to whether Plaintiff has sufficiently alleged that she suffered an adverse employment action. Defendant argues that because Plaintiff resigned soon after reporting the sexual assault to her manager, she "decided to not return to the Club, and did not give Defendant a chance to retaliate." ECF No. [22] at 12-13.[6] Contrary to Defendant's contention, courts have recognized that constructive discharge can constitute an adverse employment action under Title VII. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). "The inquiry is

---

[6] Relevant to the third element, the Court notes that Defendant misstates the breadth and nature of the protected activity alleged by Plaintiff. Defendant does not contest that "reporting an assault on the premises likely qualifies as protected conduct[,]" as Plaintiff did when she reported her sexual assault by a patron in Defendant's common area then resigned that same day. ECF No. [22] at 13. However, Plaintiff's alleged protected conduct predates that sexual assault and Plaintiff's report to her manager that same evening. Plaintiff alleges that her protected activity started earlier and encompasses her refusal to engage in commercial sex for Defendant and her rebuffing of Lopez's sexual advances. The Court does not reach the issue of whether this was protected conduct, as it was not briefed by the parties.

objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.* "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citation omitted). "A plaintiff must show the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Id.* at 1298 (citation omitted). A plaintiff can establish the second element of a retaliation claim if they show constructive discharge. *See Beltrami v. Special Couns., Inc.*, 170 F. App'x 61, 62 (11th Cir. 2006).

Here, Plaintiff has plausibly alleged that she suffered an adverse employment action in the form of constructive discharge. Her allegations are that she was propositioned for commercial sex by her manager, and raped by a patron in the VIP room. Five days later, another patron inserted his fingers into her vagina during a lap dance in the common area at Defendant's Club. The patron responsible for the second incident was never properly removed from the premises and subsequently fondled her. Few could argue that Plaintiff has alleged work conditions so unbearable that a reasonable  person in her position would be compelled to resign. Plaintiff has adduced sufficient facts to plausibly claim that she was constructively discharged.

The Court next turns to the third element to determine whether Plaintiff has sufficiently alleged a causal connection between the protected activity and the adverse employment action. "[A] plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer[.]" *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360. "Regarding the third element, to establish a causal connection between protected activity and an adverse employment action, a plaintiff must show the protected activity and the adverse

action are not completely unrelated." *Thompson v. City of Miami Beach, Fla.*, 990 F. Supp. 2d 1335, 1341 (S.D. Fla. 2014) (quoting *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007)). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Id.* at 1364. "If there is no other evidence showing causation, the temporal proximity must be 'very close.'" *Thompson.*, 990 F. Supp. 2d at 1342 (quoting *Thomas*, 506 F.3d at 1364). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas*, 506 F.3d at 1364 (citation omitted).

First, the Court needs to identify the protected activity and adverse employment action at issue. A careful look at Plaintiff's Amended Complaint reveals that her retaliation claim identifies a broader swath of protected activity than that which Defendant considers. Plaintiff alleges that her protected activity encompasses both (1) opposing and reporting Defendant's unlawful discrimination, an allegation made with little specificity but which presumably covers her reporting of the second sexual assault to manager Otero, ECF No. [13] ¶ 111, on her last day of work; and (2) her rebuffal of the sexual advances of her manager Lopez and refusal to engage in Defendant's commercial sex scheme, *id.* at ¶ 113. Plaintiff alleges that these "informal complaints and protests" constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). As to the adverse employment action, she alleges that Defendant's failure to take any corrective action in light of the threatening sexual behavior was retaliatory, endangered Plaintiff, and led to the adverse employment action i.e. her constructive discharge. *Id.* at ¶ 117.

The only allegation in Plaintiff's Amended Complaint establishing causation between Plaintiff's refusal to engage in commercial sex with patrons and with Lopez and the constructive discharge here is temporal proximity. Plaintiff alleges she was propositioned for commercial sex by manager Lopez at the end of May 2022 and resisted his advances. She resigned due to

unbearable work conditions on June 20, 2022. *Id.* at ¶ 110. As alleged, only three to four weeks separated the alleged protected conduct and the adverse employment action. This is sufficient temporal proximity to establish a plausible causal connection between her constructive discharge and her refusal to engage in commercial sex with patrons and with Lopez. In contrast in *Thompson*, temporal proximity was insufficient where the protected conduct occurred in October 2008 and the adverse employment action occurred in February and September 2009.

Plaintiff makes similar, and sufficient, allegations for her FCRA and MDCO retaliation claims as in her claim under Title VII. As in the sex discrimination context, FCRA's retaliation clause is modeled after Title VII, and thus, Florida courts look to both Florida state law and Title VII case law to interpret the FCRA for retaliation claims.[7] *Patterson v. City of Melbourne*, 669 F. Supp. 3d 1204, 1219 (M.D. Fla. 2023); *see also Harper*, 139 F.3d at 1389. The MDCO's retaliation provision is likewise substantively identical to Title VII where relevant to this case, and the Court applies Title VII case law when construing it as well.[8]

Accordingly, Defendant's Motion to Dismiss Counts II, V, and VIII for retaliation is denied as Plaintiff has sufficiently alleged a claim of retaliation on the face of her Amended Complaint.

---

[7] Under the FCRA:
It is an unlawful employment practice for an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section. Fla. Stat. § 760.10(7).

[8] Under the MDCO:
It shall be unlawful employment practice for any employer to discriminate against any of his or her employees or applicants for employment, for an employment agency or similar organization to discriminate against any individual, or for a labor organization to discriminate against any member or applicant for membership because he or she has opposed any practice made unlawful by this article or because he or she has testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this article.
MDCO, ch. 11A, art. IV, § 26(4).

## B.  TVPRA Claims

Plaintiff asserts two counts against Defendant for violation of the TVPRA, 18 U.S.C. § 1591 for "[s]ex trafficking of children or by force, fraud, or coercion": Count IX, where she alleges Defendant committed sex trafficking by force and/or coercion under § 1591; and Count X, where she alleges that Defendant violated § 1591 for participating in a sex-trafficking venture. ECF No. [13].

### i.    Sex Trafficking by Force/Coercion: Count IX

Defendant contends that Plaintiff merely pleads implausible facts and legal conclusions in the TVPRA Counts, thus leading to a shotgun pleading. ECF No. [22] at 15. Plaintiff responds that she has met the elements of sex trafficking by force/coercion, since Defendant knew that Plaintiff would be caused to engage in a commercial sex act. ECF No. [27] at 16-17. Moreover, Defendant recklessly disregarded that force, threats of force, fraud, coercion would be used to cause Plaintiff to engage in a commercial sex act, by not having security guards present when Plaintiff was in the VIP room with a patron and was raped. *Id*. Plaintiff was encouraged to engage in a commercial sex act to obtain a higher salary for herself and for Defendant when she was propositioned to engage in "extras." *Id.* Defendant replies that Plaintiff has not plausibly alleged sex trafficking by force or coercion under § 1591, as she pleads no facts demonstrating that Defendant or the Club managers used force, threats of force, or coercion to cause Plaintiff to engage in a commercial sex act. ECF No. [28] at 7-9.

"The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). The TVPRA creates a civil remedy for its violations in 18 U.S.C. § 1595(a):

An individual who is a victim of a violation of this chapter may bring a civil action

28

against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

Under § 1591(a):

(a) Whoever knowingly—(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

The Court considers whether Plaintiff has plausibly alleged sex trafficking by force or coercion under § 1591(a)(2). The TVPRA defines coercion as "threats of serious harm to or physical restraint against any person" or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or "the abuse or threatened abuse of law or the legal process." § 1591(e)(2). The term "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." § 1591(e)(3). [9]

Taking Plaintiff's allegations as true, Plaintiff has plausibly alleged that Defendant had at minimum a recklesss disregard of the fact that "means of force, threats of force, fraud, coercion …

---

[9] As cited by Plaintiff, the elements of the statutory claim of sex trafficking by force/coercion were separated by the Southern District of New York as requiring a plaintiff to allege the following elements: that Defendant "knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) 'knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud ... or any combination of such means will be used'; (3) 'to cause the person to engage in a commercial sex act.'" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018).

or any combination of such means will be used to cause the person to engage in a commercial sex act[,]" including coercion or force, by patrons to obtain sex from Plaintiff in Defendant's VIP rooms. § 1591(a). Specifically, Plaintiff alleges that Defendant did not protect Plaintiff when she was in a VIP room with a patron, where she was incentivized to engage in "extras," which in at least one instance led to a patron using force — rape — to obtain sex from Plaintiff. Plaintiff alleges that none of Defendant's security guards were available to Plaintiff when she screamed for help while being raped in the VIP room, ECF No. [13] ¶ 295, and the "VIP Rooms were upstairs making them far more secluded." *Id.* at ¶ 33. Plaintiff alleges she was sexually assaulted in plain sight of Defendant's employee by a patron, who "forcibly insert[ed] his fingers into her vagina" as she was giving him a lap dance. *Id.* at ¶ 61. Another employee saw it happened, and Plaintiff believed "the guest was removed from the property." *Id.* However, a couple of hours later "this guest reappeared, and again attempted to sexually fondle Plaintiff" as she fled. *Id.* at ¶ 62. Plaintiff reported this to Otero, the manager on duty, who told her: "'He fingered you twice? Why didn't you stop him?'" *Id.* at ¶ 66. After Plaintiff asked Otero to return home, while the guest remained on the Club premises, Plaintiff walked alone to her car. *Id.* at ¶ 68. Plaintiff sufficiently alleged facts to state a plausible claim that Defendant had a recklesss disregard of the fact that "means of force, threats of force, fraud, coercion … or any combination of such means" would be used to cause her to "engage in a commercial sex act." § 1591(a)(2).

In addition, Plaintiff has sufficiently alleged the commercial sex element of her claim, that Defendant "permitted its[] employees, managers, and business Patrons to regularly harass, grope, fondle, and even rape Plaintiff Doe in the interest of generating higher profits." ECF No. [13] ¶ 288. More specifically, Plaintiff alleges that Defendant made a cut of the tips paid to entertainers for commercial sex acts. Plaintiff alleges that she witnessed such a cash exchange when she saw an entertainer give $2,000 in cash to a manager. *Id.* at ¶¶ 93, 292. Taking the Plaintiff's allegations

as true, the salary or tips paid by patrons to entertainers or to Defendant in exchange for commercial sex act count as "anything of value [that] is given to or received by any person." 18 U.S.C. § 1591(e)(3). ECF No. [13] ¶¶ 284, 290.

Plaintiff has alleged that Defendant engaged in and recovered the proceeds of commercial sex by entertainers, in its VIP rooms, for a cut of the money, and had no security guards available in that area. Plaintiff alleged Defendant attempted to get her to engage in commercial sexual conduct. As a result, Plaintiff was raped in one instance and sexually assaulted in another, with no assistance of Defendant's security guards. Plaintiff  has sufficiently alleged a claim of sex trafficking by force/coercion by Defendant under § 1591.[10]

### ii.    Participating in a Sex-Trafficking Venture: Count X

Defendant argues that Plaintiff failed to adduce enough factual enhancement and merely contains conclusory statements that Defendant participated in a sex-trafficking venture. ECF No. [22] at 14, 16. Defendant contends that Plaintiff, at most, alleges Defendant was aware of sex trafficking, not that it participated in trafficking, which is insufficient to plead participation in a sex trafficking venture under the TVPRA, citing *Doe #1 v. Red Roof Inns, Inc.,* 21 F.4th 714, 719 (11th Cir. 2021). *Id.* at 15-16. Plaintiff responds that she has met the *Red Roof Inns* requirements, and Defendant was aware, benefiting and participating in the sex trafficking venture as it obtained a cut of the higher rates charged by entertainers in the VIP rooms for sexual acts. ECF No. [27] at

---

[10] Rule 10 provides, in relevant part, as follows:
A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense.
"Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). Here, Plaintiff has properly complied with Rule 10 and set forth with precision which claims she brings against Defendant here.

18.

Under the TVPRA, "a trafficking victim may sue a sex-trafficking perpetrator and 'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the Trafficking Victims Protection Act].'" *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 719 (11th Cir. 2021) (citing 18 U.S.C. § 1595(a)). A claim brought under 18 U.S.C. § 1595(a) against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture" is called a "TVPRA beneficiary claim." *Id.* at 719.[11]

To state a beneficiary claim, a plaintiff must allege that the defendant "knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." § 1595(a).[12] The Eleventh Circuit has explained that:

> to state a claim for beneficiary liability under the TVPRA: a plaintiff must plausibly allege that the defendant: (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit,[13] (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Id.* at 719.

Plaintiff has plausibly alleged that Defendant participated in a sex-trafficking venture under the TVPRA. On the first factor, Plaintiff asserts Defendant knowingly benefited from the sex-trafficking venture by getting a share of profits from selling the room to entertainers for

---

[12] The Eleventh Circuit has made clear that § 1591(e)(4)'s definition of "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)," which criminalizes "commercial sex act[s]" of minors or obtained through threat or force does *not* apply to the civil provision of the TVPRA in 1595(a) of "participation in a venture." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021)

[13] This requirement is the Eleventh Circuit's definition of "participation in a venture" according to the term's plain meaning. *Id.* at 724-25.

commercial sex. In the allegations set forth when discussing the commercial sex element of Plaintiff's claim above, Plaintiff has sufficiently alleged that "paid Sex Work was an expected part of the business model." ECF No. [13] at ¶ 317.

On the second factor, Plaintiff has adequately alleged Defendant took part in a common undertaking or enterprise involving risk and potential profit. Defendant's manager Otero pointed out to plaintiff "the 'alternate use' of the VIP rooms, placing a specific focus on pointing out napkins and trashcans to 'take care of business when up [there].' Plaintiff was later informed that there were in fact condoms stored under the trashcan." *Id.* at ¶ 313. Otero "made a point of informing Plaintiff that there were no cameras in any of the private VIP rooms" *Id.* at ¶ 32. The other manager, Lopez, asked Plaintiff she was interested in doing "extras" in exchange for additional cash, which Plaintiff describes as a "thinly veiled euphemism for sex." *Id.* at ¶ 314. He then asked Plaintiff if she would go home with him because, as he put it, "I'd spend a pretty penny on you." *Id.* at ¶ 40. Plaintiff has alleged that Defendant took part in a common undertaking or enterprise involving risk and potential profit under the TVPRA.

The Court disagrees with Defendant that Plaintiff's allegations, taken as true, merely amount to Defendant "observing" a sex-trafficking undertaking, and not participating in it under *Red Roof Inns*. In *Doe #1 v. Red Roof Inns*, the plaintiffs sued three franchisors, who licensed two hotels. 21 F.4th at 727. Hotel "franchisors financially benefitted from renting hotel rooms to the [plaintiffs'] sex traffickers" as they received a financial benefit from the franchisees' engagement in sex work. *Id.* More precisely, plaintiffs

> alleged that the franchisors investigated the individual hotels, took remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels.

*Id.*

The Eleventh Circuit explained that the plaintiffs had failed to plead a beneficiary claim against the franchisors under the second element, requiring defendants to take part in a common undertaking or enterprise involving risk and potential profit. Their complaint did "nothing to show that the franchisors participated in a common undertaking involving risk or profit that violated the TVPRA." *Id.* The court noted that "observing something is not the same as participating in it." *Id.* Judge Jordan further clarified in a concurrence that this result followed from the fact that the defendants at issue were franchisors of the hotels at issue. However, "similar claims against those who own, operate, or manage the hotels in question (e.g., franchisees) would withstand a Rule 12(b)(6) motion to dismiss." *Id.* at 729 (Jordan, J., concurring). Plaintiff's action against Defendant, which operated the Club at issue in the case, is much more akin to an action against a hotel franchisee than against a franchisor in *Red Roof Inns*. Plaintiff alleges that Defendant took part in a common undertaking or enterprise involving risk and potential profit involving commercial sex, and did not merely observe it.

On the third factor, Plaintiff has sufficiently alleged that the undertaking or enterprise violated the TVPRA as to Plaintiff. Plaintiff alleges that Defendant specifically encouraged Plaintiff to engage in commercial sex acts ("extras") through its manager. *Id.* at ¶¶ 313, 314. Plaintiff alleges that her manager, Lopez, "offer[ed] to pay a 'pretty penny' to have sex with her." *Id.* at ¶ 312. Plaintiff alleges that she was raped by a Patron in a VIP room, *Id.* at ¶ 318, and sexually assaulted by another Patron in plain sight of other staff and employees, *Id.* at ¶ 319, both within the span of five days. Plaintiff alleges that when she was raped in the VIP room, "[d]espite her screams for help and assurances from Defendant's management team as to the presence of security, Plaintiff was left to fend off her attacker alone." *Id.* at ¶ 318. Plaintiff has alleged sufficient facts to plausibly allege that the undertaking or enterprise violated the TVPRA as to her.

Fourth, Plaintiff sufficiently alleges that Defendant had constructive or actual knowledge

34

that the undertaking or enterprise violated the TVPRA as to her. "Constructive knowledge … is that knowledge which 'one using reasonable care or diligence should have.'" *Red Roof Inns, Inc*., 21 F.4th at 725 (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). Plaintiff alleges one sexual assault of which Defendant should have been aware of using reasonable care or diligence, and another of which Defendant had actual knowledge. First, "[o]n June 15, 2022, Plaintiff was forcibly raped by a male patron while in the VIP room. Plaintiff was left visibly bruised as a result of this interaction, as well as emotionally traumatized." *Id.* at ¶ 318. Through the use of reasonable care or diligence, for instance through its security guards, Defendant should have known that Plaintiff was raped in the VIP room, as indicated by her screaming or her bodily injuries. Second, Plaintiff alleges that she was assaulted by a patron in full view of Defendant's employees: "on June 20, 2022, a mere five (5) days later, Plaintiff was again sexually assaulted by a Patron, this time in the Main Room of the business and in the presence of other staff/employees." *Id.* at 319. However, Plaintiff alleges that, "when Plaintiff sought help from Mr. Otero, he failed to take into consideration her experience, instead blaming her for the assault and refusing to take any further action." *Id.* at ¶ 335. Here, Plaintiff has alleged actual knowledge that Plaintiff was being coerced to engage in a sex trafficking venture in violation of the TVPRA.

Therefore, Defendant has not carried its burden to establish that Plaintiff has failed to state a plausible claim that Defendant violated § 1591 for participating in a sex-trafficking venture. *Sprint Sols.*, 44 F. Supp. 3d at 1228. Defendant's Motion to Dismiss is denied as to Count X of Plaintiff's Amended Complaint.

### C.  Dismissal of State Law Claims

Defendant moves to dismiss Plaintiff's state law claims if Plaintiff's federal claims are dismissed. *See* ECF No. [22] at 16-17. Since the Court does not dismiss the challenged federal counts of Plaintiff's complaint, the Court denies this request as moot.

Case No. 23-cv-23497-BLOOM/Torres

**D. Leave to Amend the Complaint**

Plaintiff requests leave to amend her Amended Complaint in the event of a dismissal in a footnote in her Response. ECF No. [27] at 19 n. 2. Defendant replies that such a request is procedurally improper. ECF No. [28] at 8-9. Since the Court does not dismiss the challenged counts of Plaintiff's Amended Complaint, the Court denies this request as moot.

**IV. CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss for Failure to State a Claim, **ECF No. [22]**, is **DENIED**.

2. Defendant shall file an Answer to the Amended Complaint **by May 3, 2024.**

**DONE AND ORDERED** in Chambers at Miami, Florida on April 19, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record