UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 23-cv-23497-BLOOM/Torres**

JANE DOE,

      Plaintiff,

v.

MIAMI GARDENS SQUARE ONE, INC.,
*individually and d/b/a* TOOTSIE'S
CABARET MIAMI,

      Defendant.

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Defendant's Motion for Summary Judgment ("Motion"), ECF No. [45], filed on November 6, 2024. Plaintiff filed a Response, ECF No. [58], to which Defendant filed a Reply and Response, ECF No. [63]. With leave from the Court, Plaintiff filed a Surreply, ECF No. [73], pursuant to which Defendant filed a Notice to Complete Statements Under Federal Rule of Evidence 106. ECF No. [74]. The Court has reviewed the Motion, all opposing and supporting submissions,[1] the record in the case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted in part and denied in part.

---

[1] Defendant filed a Statement of Material Facts ("SMF") in support of its Motion for Summary Judgment, ECF No. [46]. Plaintiff filed Response Statement of Material Facts ("Response to SMF"), ECF No. [59], to which Defendant filed a Reply Statement of Material Facts, ECF No. [64].

## I.  BACKGROUND

### A.  Material Facts

#### 1.      Work Conditions

Based on the parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Plaintiff worked as an entertainer at a club owned by Defendant Miami Gardens Square One, Inc., doing business as Tootsie's Cabaret Miami ("Club"). Plaintiff performed at the Club for ten days during the period from May 21, 2022, to June 20, 2022. ECF Nos. [46] ¶ 2, [59] ¶ 2. Plaintiff signed an Entertainer License Agreement ("Agreement") to perform at the Club. ECF Nos. [46] ¶ 3, [59] ¶ 3. Plaintiff charged her customers $1,600.00 for her VIP room services, but she would typically negotiate for $1,950.00, by telling her customers the Club will deduct $350.00 from her initial fee. ECF No. [46] ¶ 6. Plaintiff testified, and Defendant does not dispute, that the "$350.00" utilized for the purpose of this calculation was based on her best recollection as she was "not entirely sure the amount taken out." ECF Nos. [59] ¶ 6, [64] ¶ 6. All expenses related to clothing, makeup, and hair were borne by the entertainers themselves, including Plaintiff. ECF Nos. [46] ¶ 12, [59] ¶ 12. Plaintiff terminated her relationship with the Club voluntarily on June 20, 2022. ECF Nos. [46] ¶ 13, [59] ¶ 13.

The following facts are disputed:

Defendant claims that Plaintiff had wide discretion over what she charged for VIP services (where she danced for a customer in a VIP room). ECF No. [46] ¶ 4. Plaintiff responds that while Plaintiff was able to set the maximum of what she charged for VIP services, Defendant required that the VIP room rate be, at minimum, eight hundred dollars, of which Plaintiff was required to provide to Defendant as a "House Fee." ECF No. [59] ¶ 4. Plaintiff states that Defendant similarly required a "Dance Track" employee to monitor the rooms and

payments. *Id.* Furthermore, Plaintiff states that Defendant required that "Performance Fees" as presented to the customers are "non-discretionary mandatory service charges, not tip or gratuities to Plaintiff." *Id.* Defendant replies that Plaintiff indicated she is "not entirely sure on the 800" of the VIP room rate and noted that the entertainer's House Fee is $40.00. ECF No. [64] ¶ 4.

Defendant claims that the manner in which entertainers perform is entirely up to them, as demonstrated by Plaintiff's personal experience and her observations of how other entertainers handle their footwear during performances. ECF No. [46] ¶ 9. Plaintiff responds that:

> Other than the physical dancing, Plaintiff's "performance" was heavily controlled and dictated by the Defendant. Defendant not only set the Stage Rotation but also set specific rules regarding the "flow" of each set. As Plaintiff explained, "there were multiple stage sets" [ECF No. 45-2 at 35-36]. On Weekdays, Defendant would limit access, only opening the main stage and upper stage. *Id.* On weekends, Defendant opened the full array of stages, having its entertainers perform a longer rotation between six stages. *Id.* Defendant further set requirements as to the level of undress and at what locations. Defendant required Plaintiff and her colleagues to be topless by the completion of their first song, and completely nude and on the lower stage by the end of the second song. *Id.* at [35]; *See also* [ECF No. 45-8 at 2(2)(a)]. Furthermore, Defendant set restrictions as to overall dress and undress, ensuring that the entire VIP area was fully nude while the remainder of the club was expressly limited to being topless. [ECF No. [45-2] at 46, 50]. Defendants also had requirements as to the wardrobe Plaintiff was permitted to wear. While she was able to ultimately select her own final garments, Defendant required that entertainers (1) wear at minimum[,] six-inch heels, (2) have make-up and hair done in accordance with Defendant's "standard," and (3) wear a top and bottom that must be removable. *Id.* at [51-52].

ECF No. [59] ¶ 9. Defendant does not meaningfully dispute these assertions. ECF No. [64] ¶ 9.

Defendant states that Plaintiff made money based on the amount she could get customers to agree to pay her, which was based entirely on her own skill and acumen. ECF No. [46] ¶ 10. Plaintiff disputes this and states that the only space in which Plaintiff had autonomy in her earning was in the excess fee she could request in the VIP Rooms; otherwise, Plaintiff was required to abide by Defendant's written and verbal fee and tip structures. ECF No. [59] ¶ 10. Plaintiff states that Defendant set and maintained a "House Fee," which varied based on their

assigned shifts. *Id.* Defendant responds that entertainers, including Plaintiff are not required or forced to tip managers or any other Club employees. ECF No. [64] ¶ 10. Further, Defendant states that Managers did not dictate or tell Plaintiff how to dance or engage with Club customers. *Id.*

### 2.       Sexual Harassment and Sexual Assault Policy

The following facts are disputed:

Defendant asserts that it is Club policy for employees to submit an incident report for allegations of sexual harassment or sexual assault. ECF No. [46] ¶ 15. Plaintiff responds that while Defendant asserts that it maintains an Equal Employment Opportunity policy, the sole copies of this policy reflect it being disseminated to the managers and lacking any express detail other than "report to management." ECF No. [59] ¶ 15. Defendant replies that:

> Employees are informed before the start of their employment of the policies regarding reporting incidents. (Exhibit F, Declaration of Defendant's Corporate Representative, ¶ 4). Entertainers are informed by management to report any and all incidents of sexual harassment or sexual assault to one of the managers or other Club representatives. *Id*. Once the managers have been informed of an incident, and if the incident occurs with a patron, the managers will ask the patron to leave the premises. *Id*. If any employee, agent, or personnel affiliated with the clubs is found to have engaged in any sexual harassment or criminal conduct at all, he or she would be subject to disciplinary measures, including immediate termination. *Id*. An incident report is then made and kept with the Club's records. *Id*.

ECF No. [64] ¶ 15. Further, Defendant claims that every Club employee was made aware of the Club's zero-tolerance policy pertaining to sexual harassment and sexual assault, and its reporting requirements, before the start of their employment. ECF No. [46] ¶ 16. Plaintiff responds that while Defendant asserts it maintains an equal employment opportunity policy, copies of this policy are disseminated to the managers and lack any detail other than "report to management." ECF No. [59] ¶ 16. Plaintiff asserts that Defendant failed to provide any information regarding what action she should take in the event she is harassed by a supervisor,

co-worker, or patron. *Id.* Defendant replies that Entertainers are informed by management to report all incidents of sexual harassment or sexual assault to one of the managers or other Club representatives. ECF No. [64] ¶ 16.

### 3.     Sexual Assault by Club Customers

Plaintiff's instant action stems from two sexual assaults allegedly committed by Club customers against Plaintiff on June 15, 2022, and on June 20, 2022. The following facts are disputed:

Defendant states that there is no evidence that the Club had notice of wrongful conduct necessary to stop the June 15, 2022 or June 20, 2022 incidents from occurring. ECF No. [46] ¶ 20. Plaintiff responds that, "[a]s it relates to Plaintiff being raped on June 15, 2022, the VIP Rooms are all supported by a central Dance Track staff member who checks in the Plaintiff and the patron/customer each time she escorts someone upstairs, including taking said customer's name, signature and fingerprint." ECF No. [59] ¶ 20. Further, Plaintiff states despite those procedures, almost immediately after she and the customer entered the VIP room:

> [T]he customer demanded Plaintiff remove all of her clothing at which point he stood and grabbed Plaintiff from behind [wrapping one arm around her waist and placing his other hand over her face and mouth.] ECF No. [45-2] at 95-97]. Plaintiff immediately began yelling, screaming for the attention of the Dance Track employee to no avail. *Id*. Despite only having been in the room for no more than five minutes, the Dance Track staff, whose station was no more than ten feet from her room, was nowhere to be found as Plaintiff screamed for help. "There's no way he didn't hear." *Id*. When the customer finished, Plaintiff was finally able to leave the room only to notice that the Dance Track staff had in fact abandoned her. *Id*. at P. 104:12-25. At that time, the sole manager on duty, and certainly not upstairs to protect her, was Mr. Lopez. *Id*. at 105:2-6. Simply stated, had the Dance Track staff been present, the rape would have been interrupted if not outright prevented . . ..
>
> As to the sexual assault on June 20, 2022, as Plaintiff was dancing, the customer proceeded to forcibly insert his finger into Plaintiff's vagina without her consent. *Id*. at 57:5-22. Understandably, Plaintiff became emotional and began to yell at the customer, drawing the attention of the Dance Track employee nearby. *Id*. at

58:3-21. As the Dance Track employee broke up the incident, he assured Plaintiff he would "take care of it" and walked off in the direction of the customer. *Id*. at 61:1-12. While Plaintiff believed that the Dance Track employee was acting to prevent ongoing harassment, to her surprise, she saw the same customer at the bar later that same evening as she was leaving the VIP Rooms with another customer. *Id*. at 61:13-24. As she walked by, the customer instructed her to come over, at which time the customer again tried to forcibly grab her vagina. *Id*. at 62:3-63:2.

*Id*. Defendant replies that there is no evidence the Club had notice of wrongful conduct to stop the alleged June 15, 2022 and June 20, 2022 incidents from occurring. ECF No. [64] ¶ 20.

### 4.    Manager Misconduct

The following facts are disputed: in response to Plaintiff's initial allegations that comments from manager Fernando Otero insinuated that entertainers engaged in sexual acts for money when in the VIP rooms, ECF No. [13] ¶¶ 31-32, 90, Defendant states that Otero has not been employed by the Club at any time since 2011, over ten years before the allegations formed the basis of this lawsuit. ECF No. [46] ¶ 21. Plaintiff alleges meeting four separate managers when she began her employment — Otero, "Christian," Adams, and an unknown fourth individual, who were inconsistent in identifying themselves. ECF No. [59] ¶ 22. Defendant replies that Plaintiff was "very very sure" it was Otero with whom she interacted. ECF No. [64] ¶ 22.

Defendant asserts that manager Robert Lopez never spoke to, texted, or made any sexual advances toward Plaintiff. ECF No. [46] ¶ 23. Plaintiff responds that Lopez called and texted Plaintiff during one of her first shifts, at or around 3:00 a.m. *Id.* (citing ECF No. [45-2] at 79-80). Plaintiff asserts that Lopez texted Plaintiff that they should meet, and she shrugged it off as typical manager behavior, even if a bit alarming. *Id.* (citing ECF No. [45-2] at 80-81). Plaintiff asserts that a week after Lopez commented on her appearance, he propositioned Plaintiff, asking if she did "extras," before immediately stating "I would pay a pretty penny on you." *Id.* (citing

ECF No. [45-2] at 67). Plaintiff understood in no uncertain terms that his reference to "extras" was implying sexual acts for money. *Id.* (citing ECF No. [45-2] at 77). Plaintiff refused, stating that she did not do extras before walking away. *Id.* (citing ECF No. [45-2] at 78). Defendant reasserts that Lopez never spoke to, texted, or made any sexual advances toward Plaintiff and it is undisputed that there are no text messages in evidence between Lopez and Plaintiff. ECF No. [64] ¶ 23.

Defendant contends that if Plaintiff and Lopez had any verbal conversations, there would be only two conversations between them. ECF No. [46] ¶ 24. Plaintiff disputes this and reiterates the details of the conversation. ECF No. [59] ¶ 24. Plaintiff asserts Defendant propositioned Plaintiff, asking if she did "extras," before immediately stating "I would pay a pretty penny on you." *Id.* (citing ECF No. [45-2] at 67). Plaintiff asserts she understood in no uncertain terms that his reference to "extras" was implying sexual acts for money. *Id.* (citing ECF No. [45-2] at 77). Plaintiff refused, stating that she did not do extras before walking away. *Id.* (citing ECF No. [45-2] at 78). Defendant replies that Plaintiff stated in her deposition that "[she] only had two conversations with [Lopez.] The first one was when he asked [her] name [and her] age. And then the second one was" when he allegedly said he'd spend a pretty penny on her. ECF No. [64] ¶ 24 (citing ECF No. [45-2] at 78). Defendant cites to Plaintiff's deposition that if any text messages were sent by Lopez to Plaintiff, they were "not anything significant" and were not "anything specific." ECF No. [46] ¶ 25 (citing ECF No. [45-2] at 80). And if any text messages were sent, Plaintiff did not feel like it was inappropriate; rather, it felt like "a normal manager relationship." *Id.* at ¶ 26 (citing ECF No. [45-2] at 80). Plaintiff restates that to the best of her recollection, Lopez texted Plaintiff saying that they should meet, and she shrugged it off as typical manager behavior, even if a bit alarming. ECF No. [59] ¶¶ 25-26.

Defendant states that the Club prohibits prostitution at any level, including, but not limited to, assignation, solicitation, and pandering of prostitution. ECF No. [46] ¶ 18. There are several signs throughout the Club stating there is zero tolerance for any criminal activity, including illegal drug related activity, prostitution, and acts of violence. ECF No. [46] ¶ 19. Plaintiff responds that while Defendant purports to have a policy printed on its premises prohibiting prostitution she observed conduct and overheard numerous comments indicating prostitution did occur on club premises in violation of the policy. ECF No. [59] ¶ 18. Plaintiff does not dispute there are signs throughout the club stating there is zero tolerance for criminal activity. *Id.* at ¶ 19.

### 5.    Plaintiff's Claims

In her Amended Complaint, Plaintiff asserts 15 claims against Defendant: Gender Discrimination-Hostile Work Environment under Title VII, 42 U.S.C. § 2000e-2(a) (Count I); Retaliation under Title VII, 42 U.S.C. § 2000e-3(a) (Count II); Gender Discrimination-Hostile Work Environment under the Florida Civil Rights Act ("FCRA") § 760.10(1)(a) (Count III); Retaliatory Hostile Work Environment under FCRA § 760.10(7) (Count IV); Retaliation under FCRA § 760.10(7) (Count V); Gender Discrimination-Hostile Work Environment under Miami-Dade County Code of Ordinances ("MDCO"), Chapter 11A, Article IV, Section 26(1) (Count VI); Retaliatory Hostile Work Environment under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VII); Retaliation under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VIII); Sex Trafficking by Force and/or Coercion under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 (Count IX); Participating in a Venture under the TVPRA, 18 U.S.C. § 1591 (Count X); Negligence (Count XI); Negligent Training (Count XII); Intentional Infliction of Emotional Distress (Count XIII); Negligent Infliction of Emotional

Distress (Count XIV); and Vicarious Liability for Sexual Assault and Battery (Count XV). *See generally* ECF No. [13]. Defendant seeks summary judgment on Count I, Count II, Count III, Count VI, Count IX, Count X, Count XI, Count XII and Count XIII. *See generally* ECF No. [45].

Defendant moves for summary judgment on the above-mentioned counts count because Defendant contends Plaintiff is not a covered employee under the applicable hybrid approach — a prerequisite to the federal and state employment claims — and there is no evidence that Defendant cultivated a hostile work environment, participated in sex trafficking, or acted negligently. Plaintiff responds there are issues of material fact that preclude summary judgment.

## II. LEGAL STANDARD

The court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee*, 695 F.2d at 1296.

### III. DISCUSSION

### A. Employer/Employee Relationship

Defendant argues that Plaintiff's hostile work environment claims under Title VII, the FCRA, and the MCDO fail because there is insufficient evidence to support a jury finding that Plaintiff is a covered employee, a prerequisite to her federal and state employment claims. ECF No. [45] at 10. Plaintiff responds that Defendant exerted meaningful control of Plaintiff under the hybrid test and Defendant purposely misclassified Plaintiff as an independent contractor. ECF No. [58] at 3-4. Defendant replies that the only individuals Plaintiff identifies as asserting control over her are Otero and Lopez. However, Otero never worked at the Club at the same time as Plaintiff, and Plaintiff testified she only spoke to Lopez twice and not about entertaining or rules. ECF No. [63] at 2. Plaintiff replies that the depositions of manager Michel Hernandez Rivero and Lopez, Defendant's employees, establish that Defendant exercised meaningful

control over Plaintiff. ECF No. [73] at 2. Defendant filed a Notice to complete Lopez and Hernandez's statements under Federal Rule of Evidence 106. ECF No. [74].

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To determine whether Title VII applies, a court must first determine the plaintiff's employment status. This is because "[t]he protection against sex discrimination provided by Title VII extends only to employees and is not afforded to independent contractors." *Taylor v. BP Exp., Inc.*, No. CV 407-182, 2008 WL 5046071, at *3 (S.D. Ga. Nov. 24, 2008). Title VII defines "employee" to mean "an individual employed by an employer . . .." 42 U.S.C. § 2000e(f). Congress intended the term "employee" to be interpreted according to its common, everyday meaning. *See Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11thCir. 1982) (citing to *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618 (1944)).

To establish whether an individual is an employee, courts must follow a hybrid approach:

> [I]n the context of federal employment discrimination statutes, such as Title VII and the ADEA, a hybrid approach applies. *Id.* "Under the hybrid approach, [a court] look[s] at the common-law agency test, tempered by a consideration of the economic realities of the hired party's dependence on the hiring party." *Id.* (quotations and citations omitted); *see also Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir. 1982).

*Bolton v. Rock N Massage, Inc.*, Case No. 19-cv-60008, 2019 WL 1296872, at *2 (S.D. Fla. Mar. 21, 2019). The Eleventh Circuit has explained that because there is "no indication that Congress intended the words of the statute to have anything but their ordinary meaning as commonly understood," the term "employee . . . is to be construed in light of general common law concepts" considering the "economic realities of the relationship." *Cobb*, 673 F.2d at 340-41.

"[I]t is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative." *Id.* at 341.

Courts are expected to review the following eleven factors to determine whether the economic realities of the work relationship establish that one is an employee:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Cobb*, 673 F.2d at 340 (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 832 (7thCir. 1981)). In addition, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product [or service] is accomplished." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). The employer's right to control "the means and manner of the worker's performance is the most important factor to review . . .." *Cobb,* 673 F.2d at 340. "If the employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* (quoting *Spirides*, 613 F.2d at 831-32).

When applying the hybrid approach, courts separately consider: (1) the eleven factors cited above, and (2) the employer's right to control the employee. *See Cuddeback v. Fla. Bd. Of Educ.*, 381 F.3d 1230 (11th Cir. 2004); *see Taylor,* 2008 WL 5046071, at *3; *see also Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1373-76 (M.D. Ga. 2005). The Court follows this

approach here. Though the Court previously analyzed each factor in addressing Defendant's Motion to Dismiss, see ECF No. [29], the Court now considers each factor in light of the evidence in the record.

### 1.      Type of Work Performed

Defendant argues that it had no control over Plaintiff as the manner in which entertainers perform is entirely up to them, as demonstrated by how they handle their footwear, and the Club does not tell entertainers how to dance. ECF No. [45] at 11-12. Further, Defendant points out Otero did not work at the Club at the same time as Plaintiff, and Plaintiff testified she only spoke to Lopez twice, which does not indicate control. *Id.* Plaintiff responds that Defendant not only set the Stage Rotation, but also set specific rules regarding the "flow" of each set. ECF No. [58] at 5. As Plaintiff explained, "there were multiple stage sets" on weekdays and weekends and Defendant set requirements as to the level of undress and at what locations. *Id.* Defendant replies there is zero evidence that the Club tells entertainers how to conduct their business and there is no evidence of control with respect to Plaintiff. ECF No. [63] at 2. Plaintiff states in her Surreply that Hernandez's deposition supports that Defendant is wholly responsible for setting the stage rotation and ensuring the employed entertainers are performing in accordance with their rotation, as well as ensuring entertainers are not nude on the main floor or overly intoxicated. ECF No. [73] at 3.

The first factor considers "the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision[.]" *Cobb*, 673 F.2d at 340 (citation omitted). Defendant points to the declaration of Sally Chew, the corporate representative of Tootsie's Cabaret Miami which states that "[u]nless an entertainer wishes to perform in the capacity of an employee, she must execute an ELA in

order to begin providing entertainment services at Tootsie's Cabaret Miami as an independent contractor." ECF No. [45-6] ¶ 2. Defendant also refers to Plaintiff's testimony that she "only had two conversations" with Lopez as evidence managers had no control over Plaintiff. ECF No. [45-2] at 78.

However, Plaintiff succeeds in identifying evidence that the type of work performed required control by Defendant. Plaintiff points to evidence that indicates control by managers. Hernandez testified that he ensured "the order in which girls go to stage" and that the entertainers did not engage in prohibited behavior, such as:

> Getting fully nude on the main floor, which is not allowed, walking around barefoot, for example, which is not allowed. If the bartender tells me that they think that an entertainer is drinking too much, she tells me. I go in and talk to her, offer her water, stuff like that.

ECF No. [73-1] at 19-21. Further, Hernandez testified that managers help check in and check out entertainers from the VIP rooms to ensure they are not called to go on stage when in the rooms: "[t]he guy working the [VIP] rooms sees her walk out or she checks out with him. Then he calls the DJ helper, puts her back in rotation . . .." *Id.* at 47-48. Plaintiff's testimony demonstrates that a manager, who she believed to be Otero, exercised some control over the entertainers.

> A: . . . he was in charge of managing all of the girls, making sure that we all were in proper uniform, that we came in and paid our fees at the correct time, followed all the rules.
> Q. Okay. So I've got making sure that you wear the proper uniform, pay the fees and followed the rules. What were the rules?
> A. The rules of the club such as who we had to tip out, how would the stage set work [(sic)], how we were supposed to charge for the rooms, the charges of the dances.
> Q. Okay.
> A. And what we have to do when we're on stage, as well.
> Q. All right. Let's address those one by one. So the tip-out, first. What were the rules related to tip-outs?

A. There was a mandatory $5 manager tip-out every night. There was a $10 valet fee.
Q. Is that whether or not you drove?
A. It's mandatory because there was a lot in the back. So if you were to Uber, then you wouldn't have to pay it.
Q. Okay.
A. And there was a DJ tip-out mandatory fee. And the rule is 10 percent for that.
Q. 10 percent of what?
A. Your earnings that night. Not regarding what you paid to work, your total earnings that night.

ECF No. [45-2] at 24-25.

Further, Plaintiff points to evidence that Defendant controlled the level of undress of entertainers. Plaintiff testified that when performing, "you had to be topless by the first song. You had to be completely nude by the second song. You would have to be on the lower stage by the second song, as well." *Id.* at 35-36. Plaintiff also refers to the License Terms and Conditions between Plaintiff and Defendant, stating that: "[t]he Licensee agrees to: a. Perform clothed, topless, and nude (where permitted)[.]" ECF No. [45-8] at 2. When asked if she "ever decline[d] to take your top off during, for example, the first song on the stage?" Plaintiff responded "It's mandatory. It was very set out in those rules when I first got hired . . .. It was explained verbally by [] Otero." ECF No. [45-2] at 36. Further, Plaintiff testified that Defendant regulated the level of undress in the lap dance area where "downstairs[,] only topless is allowed . . .. Bottoms have to stay on[,]" *id.* at 13, and in the VIP rooms, where "you were allowed to be fully nude," *Id.* at 50. Plaintiff indicates that dancers purchase heels prior to employment, which "had to be at least six inches." *Id.* at 51. Plaintiff explained that "[y]ou cannot get hired without them." *Id.*

Plaintiff also testified to additional examples of Defendant's control over entertainers: "[i]f it was a weekend you would have a longer stage rotation where you would move between six stages for a set amount of songs." *Id.* at 35-36. Plaintiff testified that "when we got hired[,] they assigned us the shift . . .. I was assigned to the night shift so I could come in between 7:00

and 8:00 p.m., and I had to leave by 4:00 a.m." *Id.* at 27. Plaintiff testified that the amount of fees entertainers paid to Defendant was heavily regulated.

> A. The fee, whenever we were to do either a lap dance on the floor, there's $5 taken out of every song for that. And then if were to do a VIP room upstairs, there is a set amount.
> I believe it's $350 but I'm not entirely sure the amount taken out of that, as well. Either we pay it or we have the customer pay it, but it does come out of our earnings.
> Q. When you say 350 is taken out, is that on a per-hour basis?
> A. Yes.
> Q. Do you know how much a VIP room is per hour?
> A. It's up to the girl, individually, to charge.
> Q. So the amount that, for example, you as an entertainer would charge for time in the VIP room is up to your discretion?
> A. It is.
> They have set fees. So I believe the minimum that Tootsie's [(sic)] is 800 for the hour. But you can charge anything on top of that.

*Id.* at 26-27. Additionally, Defendant tracked the number of lap dances performed, of which Defendant would make a $5 cut. *Id.* at 38-40.

Plaintiff testified the type of work she performed was subject to supervision by Defendant. Defendant assigned entertainers to shifts, regulated how and when they were to undress during the set, and regulated "who [entertainers] had to tip out, how would the stage set worked [(sic)], how we were supposed to charge for the rooms, the charges of the dances . . .. And what we have to do when we're on stage, as well." *Id.* at 24.

Though entertainers appeared to still have some level of discretion, such as on how much to charge in the VIP room above the minimum of $800, entertainers were still subject to supervision. As the Middle District Court of Florida found when analyzing the control factor under the FLSA economic reality test, "[t]he mere fact that [a club] has delegated a measure of discretion to its dancers does not necessarily mean that its dancers are elevated to the status of independent contractors. Indeed, one could say that the nature of a dancer's job requires some

16

measure of discretion and flexibility." *Harrell v. Diamond A Ent., Inc.*, 992 F. Supp. 1343, 1349 (M.D. Fla. 1997). Here too, it appears that dancers were doing work under the direction of supervisors, according to the rules set out by Defendant, even if they still had some discretion.

Though Defendant argues that Otero did not work at the Club during Plaintiff's tenure and could not have exercised control over Plaintiff, that fact is not determinative. Plaintiff testified that she was confused as to the proper name of the manager who gave her a tour and sexually harassed her. ECF No. [58] at 16-17. Though Otero may not be the correct name of the manager who introduced Plaintiff to the Club, "the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016).

## 2.    Skill Required

Defendant argues that Plaintiff had considerable skill at her job, as demonstrated by her $1,600 an hour salary in the VIP section, which weighs in favor of an independent contractor status. ECF No. [45] at 12. Further, Defendant states that her high level of pay was based on her skill and acumen. *Id.* Plaintiff responds that courts have routinely found that exotic dancing does not require special skills, and the court in *Shaw* found that clubs exercise significant control over dancers even if dancers can hustle more to increase their profits. ECF No. [58] at 5-6. Plaintiff points out that potential employees are required to audition for their roles as entertainers, which is overseen by the Entertainer Manager. ECF No. [73] at 3.

Courts have looked at whether exotic dancing requires a special skill under a different employment test than the one at issue here: under the Fair Labor Standards Act ("FLSA"). Defendant is correct that the test pursuant to the FLSA is different than under federal discrimination law, ECF No. [63] at 2. The FLSA economic reality test determines whether an individual is an employee or an independent contractor using different factors than the hybrid

approach used to determine employee status under Title VII.[2] Still, the hybrid approach's second factor is "the skill required in the particular occupation[,]" *Cobb*, 673 F.2d at 340, which mirrors the fourth factor under the FLSA economic reality test which is "whether the service rendered requires a special skill[.]" *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1342–43 (N.D. Ga. 2011). Consequently, court decisions as to whether exotic dancing is a special skill in the FLSA context are instructive.

In the FLSA context, "[o]ther courts have nearly all held that there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer." *Shaw v. Set Enterprises, Inc.*, 241 F. Supp. 3d 1318, 1326 (S.D. Fla. 2017) (citation and internal quotation marks omitted); *see also Morse v. Mer Corp.*, No. 1:08-CV-1389-WTL-JMS, 2010 WL 2346334, at *5 (S.D. Ind. June 4, 2010); *Schofield v. Gold Club Tampa, Inc.*, No. 8:19-CV-3097-VMC-TGW, 2021 WL 533540, at *4 (M.D. Fla. Feb. 12, 2021). In *Shaw,* this Court found that the "special skill" factor under the FLSA economic reality test weighed in favor of employee status where "defendants did not

---

[2] Under the FLSA, "[t]he test of employment under the Act is one of economic reality." *Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1342–43 (N.D. Ga. 2011) (quoting *Tony and Susan Alamo Found. v. Sec'y of Lab.,* 471 U.S. 290 301 (1985) (additional level of citations and quotations omitted). The economic reality test requires courts to consider several factors to determine whether an individual is an employee or independent contractor, including:

    (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
    (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
    (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
    (4) whether the service rendered requires a special skill;
    (5) the degree of permanency and duration of the working relationship;
    (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1342–43 (N.D. Ga. 2011) (quoting *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006) (citation omitted).

require prospective Dancers to have any formal training or prior experience [and t]he only requirement to work at the Clubs was that the Dancer was an attractive female." *Shaw*, 241 F. Supp. 3d at 1326. Similarly, the Middle District Court of Florida was "not persuaded that the job required a special or unusual skill" when "Plaintiff did not have prior dancing experience before entering into the license agreement" and "[t]here were no dance seminars, no instruction booklets, and no choreography whatsoever." *Harrell*, 992 F. Supp. at 1351. Instead, the only requirement was that the dancer "had to be moving." *Id.*

Plaintiff testified that her only prior experience "in the adult entertainment industry" before working for Defendant was as an entertainer at a cabaret in Denver "for less than one month before [she] moved to Miami." ECF No. [45-2] at 10-11. Further, she testified that she elaborated her "stage dance routine[,]" such as "how she interacts with customers, how I do dances" by herself. *Id.* at 136. Contrary to Defendant's characterization, Plaintiff charging a high fee does not indicate that she had a high level of skill. As the court cited in *Shaw*, "[a]lthough different entertainers may possess varying degrees of skill, there is no indication that a high degree of skill or experience is necessary." *Shaw*, 241 F. Supp. 3d at 1326 (citing *Stevenson v. Great Am. Dream, Inc.*, No. 1:12-CV-3359-TWT, 2013 WL 6880921, at *5 (N.D. Ga. Dec. 31, 2013))

Accordingly, the record does not indicate that Plaintiff's dancing required a special skill indicative of an independent contractor. Mirroring courts who found that exotic dancing did not require a special skill in the FLSA context, the Court finds that the skill required from Plaintiff weighs in favor of an employee job, as it does not require "considerable skill and licensing requirements" typical of an independent contractor. *Taylor*, 2008 WL 5046071, at *4.

### 3.  Equipment Furnished and Place of Work

Defendant argues that the "equipment" was furnished by Plaintiff and she testified that all expenses related to clothing, makeup, and hair were borne by the entertainers themselves. ECF No. [45] at 13. Additionally, the Agreement did not require Plaintiff to perform exclusively for the Club so where Plaintiff performed was at her discretion. *Id.* Plaintiff responds that Defendant attempts to narrow the scope of the equipment by focusing on clothing, makeup and hair, but Defendant furnished all the equipment for Plaintiff to work, such as music, dressing rooms, lockers, wait staff, beverage services, advertisements of the club, and stages upon which to perform. ECF No. [58] at 6. Further, Plaintiff argues that Defendant set a "Stage List" and rotation which limited her earning ability. *Id.* On weekdays, Plaintiff had increased visibility performing on stage between five to seven times per shift, and on weekends she was limited to as little as two stage performances. *Id.* Plaintiff states that entertainers would be limited to two times in the VIP lounge on a busy night, limiting their overall earning capacity and limiting Plaintiff's access to equipment and earning possibilities by ensuring that Plaintiff and her colleagues were unable to use the private VIP rooms and lap dance rooms after their respective shifts ended, weighing in favor of employee status. *Id.*

The third factor considered by the Court is "whether the 'employer' or the individual in question furnishes the equipment used and the place of work." *Cobb*, 673 F.2d at 340. The equipment furnished and place of work factor weighs in favor of Plaintiff's employee status. Plaintiff testified that Defendant owned multiple stage sets upon which to perform. ECF No. [45-2] at 35-36. Defendant also provided VIP rooms and a lap dance area, ECF No. [45-2] at 30-31, as well as lockers. *Id.* at 33. Defendant limited Plaintiff's access to its premises by requiring them to clock in and clock out. ECF No. [45-2] at 32-33. Plaintiff deducted a fee for Defendant

from payment for lap dances and for VIP areas. ECF No. [45-2] at 41. Moreover, the Agreement

between Plaintiff and Defendant states that:

> In exchange for the Base License Fee and in addition to use of the Club premises, Licensor shall provide the following services at the Club, at Licensor's expense:
>   a. Music (including ASCAP/BMI/SESAC fees);
>   b. Dressing Room Facilities;
>   c. Lockers;
>   d. Wait Staff;
>   e. Beverage Service;
>   f. Advertisement of the Club (any advertisement specific to the Licensee shall be at Licensee's sole cost and expense and Licensor shall have no obligation to advertise for the Licensee); and
>   g. Licensee agrees that the License Fee does not include fees for the following services: hair and make-up artists and any other ancillary services which shall be contracted for and paid directly by Licensee, at Licensee's sole cost and expense.

ECF No. [45-8] at 3. Defendant focuses on Plaintiff's testimony that entertainers provide their

own heels, hair and make-up and clothing, which were at entertainers' own expense. ECF No.

[45-2] at 51-52. Though clothing, shoes, and hair and make-up could qualify as equipment, the

Court is unpersuaded that this weighs in favor of independent contractor status when the stages,

VIP rooms, lap dance area, locker rooms, music, wait staff, beverage service, advertisement, and

the entirety of the premises and amenities used by dancers were provided by the Club.

### 4.      Length of Relationship

Defendant argues that Plaintiff only worked at the Club ten days, where she made

$30,000. ECF No. [45] at 13. Plaintiff admits that her employment was brief but argues that

courts have recognized that exotic dancers and entertainers are employed within a transient

profession by its nature. ECF No. [58] at 7. Plaintiff argues this is demonstrated by her other

work, where she worked as an entertainer for one other club in Denver, Colorado for a month,

then again for three months. *Id.* at 7-8. Plaintiff urges that this factor is not determinative as to

either party. *Id.* at

Plaintiff worked for the Club only ten days. The Court recognizes "that [the nude entertainment] industry tends to be itinerant and transient in nature[.]" *Dean v. 1715 Northside Drive, Inc.*, 224 F. Supp. 3d 1302, 1321 (N.D. Ga. 2016) (citing *Harrell*, 992 F. Supp. at 1352). A short duration weighs in favor of the Plaintiff being an independent contractor.

### 5.      Method of Payment

Defendant argues that this factor weighs in favor of independent contractor status because Plaintiff did not receive hourly compensation, but rather received compensation from customers. ECF No. [45] at 13. Plaintiff responds that Plaintiff had no autonomy over her assigned shift as Defendant maintained three separate shifts and assigned its entertainers a specific schedule at the outset of their employment. ECF No. [58] at 8. Further, Plaintiff asserts that she was required to abide by Defendant's written and verbal fee and tip structures. *Id.* Plaintiff points to Hernandez's testimony that the DJ tip was part of the house rules and that Defendant set and exclusively controlled a house fee, as well as a VIP room fee. ECF No. [73] at 4-5. Defendant points out that Hernandez testified that Defendant did not require a tip-out. ECF No. [74] at 3-4.

The fifth factor is "the method of payment, whether by time or by the job." *Cobb*, 673 F.2d at 340. Here, Plaintiff was not paid an hourly salary but was paid directly by customers. Per the agreement between Plaintiff and Defendant, Plaintiff had to pay a base license fee to Defendant to occupy Defendant's premises. ECF No. [45-8] at 3. Further, Plaintiff was "entitled to retain all fees received by customers of the Club for performances of Licensee's services . . . as well as all gratuities received by Licensee, subject to administrative fees charged by the Club in exchange for possessing of credit cards, redemption of Dance Dollars, etc." ECF No. [45-8] at 3. Even if she had to pay fees in the form of tip-outs to managers, DJs, a house fee, as well as a

fee per lap dance and a fee per use of the VIP room, that form of payment is still consistent with independent contractor status. ECF No. [45-2] at 24-26, 39-41.

### 6.      Termination of Work Relationship

Defendant argues this factor does not weigh in favor of either determination, and Plaintiff terminated her relationship with the Club voluntarily. ECF No. [45] at 13. Plaintiff responds that this factor weighs in favor of employee status as Defendant maintained the right to terminate Plaintiff's employment anytime, which is emblematic of an "at-will" employment relationship. ECF No. [58] at 9. Defendant does not reply as to this specific factor. *See generally* ECF No. [63]. In her Surreply, Plaintiff points out that Hernandez's role was to enforce Defendant's policies and he had the ability to terminate entertainers' contracts or insist they leave the business property to the extent entertainers violated such policies. ECF No. [73] at 5.

The sixth factor is "the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation." *Cobb*, 673 F.2d at 340. Plaintiff is correct that the Agreement sets forth a termination process that is more typical of an employee relationship. The Agreement states that:

> The License shall be automatically extended for successive periods equal to the current term. Notwithstanding the foregoing, at any time after the first year of the License term, this License may be terminated (a) within thirty (30) days after the receipt of written termination notice from the Licensor to Licensee, (b) the last day of the month that is ninety (90) days after the receipt of a written termination notice from Licensee to Licensor, or (c) such sooner date in accordance with Paragraph 11 hereof, any of such dates which shall be the "License Termination Date." Upon the License Termination Date, Licensee shall have no further right to use and occupy the premises.

ECF No. [45-8] at 2. Plaintiff terminated her relationship with the Club voluntarily. ECF No. [46] ¶ 13, [59] ¶ 13. Though a one-sided termination without notice might be indicative of an independent contractor relationship, this fact is considered in light of the reason for Plaintiff's

resignation. Given the termination process laid out by the Agreement between Plaintiff and Defendant, the Court finds that this factor weighs in favor of employee status.

### 7.      Annual Leave

Defendant argues that the summary judgment record is silent as to this matter. ECF No. [45] at 14. Plaintiff responds that no evidence has been produced as to this factor in discovery. ECF No. [58] at 9. The Court agrees with the parties and finds that this factor does not weigh in favor of employee or independent contractor status.

### 8.      Integral Part of the Business

Defendant argues that Plaintiff, and not the Club, is integral to Plaintiff's dancing business and that no individual entertainer is integral to the Club's business, even though the Club offers a format which features entertainers generally. ECF No. [45] at 14. Plaintiff argues that courts have uniformly rejected this argument, as exotic dancers are obviously essential to the success of a topless nightclub and that this factor weighs in favor of employee status. ECF No. [58] at 10-11.

The eighth factor asks "whether the work is an integral part of the business of the 'employer.'" *Cobb*, 673 F.2d at 340. There is no question that entertainers are an integral part of the Club's business. Here too, the Court draws from the case law on employee vs. independent contractor relationships in the FLSA context. The sixth factor to determine whether an individual is an employee or an independent contractor in the FLSA economic reality test is the same as the eighth factor here: it is "the extent to which the service rendered is an integral part of the alleged employer's business." *Shaw*, 241 F. Supp. 3d at 1327. As stated by the court in the FLSA context, "[w]ithout exotic dancers, the Clubs would be ordinary bars, not strip clubs." *Id.* at 1327.

### 9.        Benefits

Defendant argues that there is no evidence that Plaintiff received benefits as an independent contractor. ECF No. [45] at 14. Plaintiff responds that she was misclassified by Defendant, no such discussions of benefits occurred, nor has any evidence been produced to indicate what options were available to the few individuals properly classified as employees. ECF No. [58] at 10.

As set forth in the Agreement between the parties, "Licensee shall be solely responsible for obtaining and maintaining, at Licensee's sole cost and expense, all necessary business licenses and permits and insurance including but not limited to, health, disability and workers compensation[.]" ECF No. [45-8] at 4. Because Plaintiff received no benefits from Defendant, this factor weighs in support of an independent contractor relationship.

### 10.        Taxes Paid

Defendant argues that as an independent contractor, there is no evidence that the Club withheld any of Plaintiff's earnings — which she, in fact, directly collected from the customers — and Plaintiff was responsible for her own taxes. ECF No. [45] at 14. Plaintiff argues that Defendant misclassified Plaintiff so that she was responsible for her own taxes. ECF No. [58] at 10.

As set forth in the Agreement between the parties, Plaintiff was "solely responsible . . . for paying all federal, state and local taxes and contributions imposed upon any income earned by Licenses at the Club." ECF No. [45-8] at 4. Because Defendant did not withhold any taxes from Plaintiff, this factor weighs in support of an independent contractor relationship.

### 11.     Intention of the Parties

Defendant argues that the Agreement between the parties is clear that "Licensor and Licensee each acknowledge and agree that the relationship of the parties hereto is that of licensor and licensee and is not an employee/employer relationship." ECF No. [45] at 14-15. Plaintiff responds that an individual's employment status is not determined by the label used in the contract between the parties. ECF No. [58] at 11.

The Agreement between the parties states as follows:

Licensor and Licensee each acknowledge and agree that the relationship of the parties hereto is that of licensor and licensee and is not an employee/employer relationship. Nothing in this Agreement shall be construed to create an employee/employer relationship between the parties hereto.

ECF No. [45-8] at 3-4. Plaintiff is correct that the Agreement between the parties is not determinative of Plaintiff's employment status. As explained by the Middle District Court of Alabama when applying the *Cobb* factors, "[d]espite the contractual language, the employment status of an individual is not determined by the label used in the contract between the parties." *Jackson v. Easter Seals Cent. Alabama*, No. CIV.A. 2:07CV315MEF, 2008 WL 2131283, at *8 (M.D. Ala. Apr. 30, 2008), *report and recommendation adopted*, No. 2:07-CV-315-MEF, 2008 WL 2131233 (M.D. Ala. May 20, 2008). Instead, the Court should apply the multiple factors of *Cobb* i.e., "the economic realities of the relationship viewed in the light of the common law principles of agency and the right of the employer to control the employee[,]" as the Court does below. *Id.* at 7. Still, as an individual factor, the intention of the parties weighs in favor of Plaintiff's independent contractor status.

As to the economic realities of the relationship, five factors weigh in favor of employee status, five factors in favor of independent contractor status, and one is neutral. The Court is persuaded that due to Defendant's right to control the means and manner of Plaintiff's

performance, addressed below, there exists a genuine dispute of material fact as to whether Plaintiff is to be considered Defendant's employee. "[T]he means and manner of the worker's performance is the most important factor to review . . .." *Cobb,* 673 F.2d at 340. "If the employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* (quoting *Spirides*, 613 F.2d at 831-32).

### 12.   Control

Defendant argues that the evidence relevant to the eleven factors considered by Courts under the hybrid approach establishes the lack of control the Club had over Plaintiff generally. ECF No. [45] at 15. Defendant contends that "the only 'evidence' of control is based on Plaintiff's testimony of Mr. Otero," yet her testimony is that she "received no rules" from Otero and Otero never worked at the Club during that time period. *Id.* (citing ECF No. [45-2] at 49). Therefore, these conversations did not happen. *Id.*. Defendant states that because Plaintiff has failed as a matter of law to establish the existence of an employer-employee relationship between her and the Club, her claims under Title VII, FCRA, and the MCDO fail. ECF No. [45] at 15-16 (citing *Cobb*, 673 F.2d at 340-41). Plaintiff responds with cases establishing that dancers exercising some discretion is not determinative of whether the dancer is an independent contractors. ECF No. [58] at 11. Plaintiff asserts that the record contains evidence of Defendant's control over Plaintiff: Plaintiff was required to work a specific schedule, sign in and out throughout her shifts, and could have her employment terminated at Defendant's discretion and had to follow a specific set of rules and policies, namely as to her appearance and performance. *Id.* at 12-13. Defendant replies that it did not exercise control over Plaintiff as the only individuals Plaintiff names as exerting control over her include, Otero, who never worked at the

club at the same time as Plaintiff, and Lopez, to whom she spoke twice. ECF No. [63] at 2. Further, Defendant asserts "there is zero evidence that the Club tells entertainers how to conduct their business and there is certainly no evidence of control with respect to Plaintiff." *Id*. Defendant argues that being an entertainer is a transient business, which further weighs in support of an independent contractor determination. *Id*. Plaintiff asserts that Hernandez's testimony establishes factors evidencing control by Defendant, such as entertainers being required to notify managers about when they need to leave their shift early, having to clock in and clock out, and Plaintiff had to pay a set house fee. ECF No. [73] at 6-7.

The Court agrees with Plaintiff that the record demonstrates significant control by Defendant over Plaintiff. Defendant required Plaintiff to clock in and clock out. ECF Nos. [45-2] at 32-33, [73-1] at 28. As Hernandez testified, an entertainer had to check out with a manager before leaving "[u]nless she has some drastic emergency that she's running out the door." ECF No. [73-1] at 48. Defendant assigned entertainers to shifts, regulated how and when they were to undress during the set, and regulated "who [entertainers] had to tip out, how would the stage set worked [(sic)], how we were supposed to charge for the rooms, the charges of the dances . . .And what we have to do when we're on stage, as well." ECF No. [45-2] at 24. Additionally, Defendant tracked the number of lap dances performed by dancers, of which Defendant would make a $5 cut. *Id*. at 38-40. Defendant also tracked Plaintiff's use of the VIP rooms. Further, Plaintiff testified that Defendant regulated the level of undress in the lap dance area where "downstairs[,] only topless is allowed . . .. Bottoms have to stay on[,]" *Id*. at 13, whereas in the VIP rooms, "you were allowed to be fully nude." *Id*. at 50. Defendant deducted a fee from payment for lap dances and for VIP areas. *Id*. at 41. Defendant controlled Plaintiff's use of the VIP rooms and deducted a fee as well. *Id*. at 40-42. Defendant also instructed Plaintiff to wear

heels longer than 6 inches. *Id.* at 51. Defendant could also terminate Plaintiff with 30 days' notice. ECF No. [45-8] at 2. The economic realities of the relationship in light of the common law principles of agency and the right of the employer to control the employee support that there is an employer-employee relationship, as do the majority of the factors listed above.

The Court's decision aligns with the case law that emerged in the context of the FLSA economic reality test. As the Northern District Court of Georgia previously stated, "several courts have addressed the question of whether a nude dancer is an employee under the FLSA, and '[w]ithout exception, these courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage.'" *Clincy*, 808 F. Supp. 2d at 1343 (citations omitted) (listing cases). Similarly, "[d]istrict courts in the Eleventh Circuit have uniformly found exotic dancers to be employees of the clubs in which they perform." *Schofield v. Gold Club Tampa, Inc.*, No. 8:19-CV-3097-VMC-TGW, 2021 WL 533540, at *4 (M.D. Fla. Feb. 12, 2021). As the court analyzed in *Shaw*, when considering the first factor of the economic reality test under the FLSA, i.e., "the nature and degree of the alleged employer's control as to the manner in which the work is to be performed," the court found:

> Defendants exercised significant control over the Dancers at the Clubs. The Dancers were required to follow "Entertainer Rules" that regulated their appearance and behavior, pay escalating house fees based on the time of their arrival, sign in for shifts, follow procedures for stage rotations, and charge minimum fees set by Defendants. The Dancers had virtually no control over the customer volume, hours, food and drink, or overall atmosphere at the Clubs. Although the Dancers could choose their shifts, clients, and which dances to perform, such discretion is typical for an exotic dancer and does not, without more, establish that the Dancers were independent agents. *See Harrell*, 992 F. Supp. at 1349–50.

*Shaw*, 241 F. Supp. 3d at 1325. Similarly here, though Plaintiff could choose what dance to perform and with which customers, Defendant otherwise regulated her appearance, behavior, the payment of fees, her clocking in and clocking out, stage rotations, and minimum fees. Those

facts evidence sufficient control over Plaintiff for Plaintiff to be considered an employee of Defendant for purpose of her anti-discrimination claims.

Further, even considering Hernandez's testimony that entertainers "work their own schedule[,]" "come and go as they please" and "can work whatever shift even if assigned a specific shift[,]," those facts are insufficient for Defendant to be entitled to summary judgment. ECF No. [74] at 3 (citing ECF No. [73-1] at 26-27). The Court does "not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate*, 839 F.3d at 1018. There is at least a genuine dispute of material fact as to whether Defendant exercised meaningful control over Plaintiff.

Accordingly, the Court considers whether Defendant is entitled to summary judgment as to the elements of Plaintiff's hostile work environment claim.

**B.  Hostile Work Environment Claim Under Title VII: Count I**

If the plaintiff is considered an employee, then the question is whether the plaintiff has adequately established the elements of their Title VII gender discrimination claim based on a hostile work environment. "While Title VII does not explicitly reference sexual harassment, the Supreme Court has recognized a violation when 'discrimination based on sex has created a hostile or abusive work environment.'" *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 707-08 (11th Cir. 2020) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). Specifically, a court must determine whether "the conduct alleged . . . created a hostile work environment that exposed [the plaintiff] to disadvantageous terms or conditions of employment to which members of the other sex were not exposed." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citation omitted). "[T]he evidence of harassment is

considered both cumulatively and in the totality of the circumstances." *Id*. at 808. To prove a

hostile work environment, the plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been
> subject to unwelcome sexual harassment, such as sexual advances, requests for
> sexual favors, and other conduct of a sexual nature; (3) that the harassment must
> have been based on the sex of the employee; (4) that the harassment was
> sufficiently severe or pervasive to alter the terms and conditions of employment
> and create a discriminatorily abusive working environment; and (5) a basis for
> holding the employer liable.

*Reeves*, 594 F.3d at 808; *see also Arnold v. Heartland Dental, LLC*, 101 F. Supp. 3d 1220, 1225

(M.D. Fla. 2015) (same elements for FCRA claims).

**1.     Elements of Hostile Work Environment Claim**

Defendant argues that it is entitled to summary judgment as there is no actual evidence of

harassment by Lopez, as he did not text, call, or even speak to Plaintiff nor inquire as to whether

she would perform sex for money. ECF No. [45] at 16. Defendant asserts that in the context of

Plaintiff performing services for money, Lopez's alleged comment that "he would spend a pretty

penny on her" is no evidence of malfeasance. *Id.* at 17. Plaintiff responds that she has satisfied

the second and third prongs of her *prima facie* case as Defendant, through its agents, repeatedly

subjected Plaintiff to disturbing and unwelcome sexual comments, and therefore, Plaintiff clears

the first hurdle of subjective hostility. ECF No. [58] at 16. Plaintiff points out that she was

confused as to the proper name of the manager who gave her a tour and sexually harassed her,

and that manager made many clear and undeniable insinuations that he expected the women to

engage in sexual activity in the VIP Rooms. ECF No. [58] at 16-17. Plaintiff asserts this was

confirmed by conduct she observed that managers served as third party facilitators for an illicit

prostitution scheme. *Id.* at 18. Plaintiff also points to comments by Lopez, known as Mr. Adams,

that purportedly escalated the harassment. *Id.* at 19. Plaintiff contends that Defendant cannot

raise a "*Faragher*" affirmative defense as it never disseminated its policy to Plaintiff, nor did the policy include any express details other than "report to management." *Id.* at 20.[3] Defendant replies that Lopez did not text, call, or even speak to Plaintiff, and they had only two interactions; Otero did not work at the Club so he could not have harassed Plaintiff; and there is no evidence of a prostitution scheme. ECF No. [63] at 2-3. Defendant also asserts it properly established the *Faragher* affirmative defense when it published its sexual harassment policy to its employees, and because Plaintiff never filed police or incident reports as to either event with Club customers, there was no failure on the part of Defendant to take corrective action which could have prevented the complained of conduct. *Id.* at 3-4.

### a.   Evidence of Unwelcome Harassment by Club Employees

[A] plaintiff wishing to establish a hostile work environment claim [must] show: (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [gender]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

---

[3] A *Faragher* affirmative defense is available to "an employer [who] is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). The elements of a *Faragher* affirmative defense are as follows:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. *Id.* at 807.

*Mejdoub v. Desjardins Bank, N.A.*, No. 14-CIV-62722, 2016 WL 4369968, at *8 (S.D. Fla. Jan. 11, 2016) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Defendant argues that Plaintiff has not established the second element of her hostile work environment "that [s]he has been subject to unwelcome harassment," whereas Plaintiff responds that she has. *Id.* Defendant states that there was no misconduct by Lopez, the Club's manager:

> Mr. Lopez' alleged comment that "he would spend a pretty penny on her" is no evidence of malfeasance. This comment most reasonably suggests that he would spend money on her for the services she performs at the Club and gets to choose the rate at which she performs them . . .. As to text messages, Plaintiff testified that "it was not anything significant," and that it felt like "a normal manager relationship." (Exhibit B at 80:14-16 and 80:22-81:2). Plaintiff further testified that she "had deleted [her] messages when [she] left the club" and cannot recover them (Exhibit B at 80:11- 12). And by itself, the alleged conversation Plaintiff had with Mr. Lopez including the 'pretty penny' comment does not rise to the level of pervasiveness required for a hostile work environment. *See Allen v. Ambu-Stat*, LLC, 799 F. App'x 703, 708 (11th Cir. 2020).

ECF No. [45] at 17. The Court looks to the totality of the conduct in the record to determine if there is a hostile work environment, and not solely the harassment by Club employees.

Here, the record establishes sufficient evidence on the question of whether Plaintiff has been subject to unwelcome harassment to survive summary judgment. Plaintiff testified she was introduced to the customer who raped her by a Defendant employee:

> Q. So a floor man introduced you to a patron?
> A. He did. I was up in the main area just standing there, and he brought a man over to me . . .. He introduced him to me, hey, this is X, Y, Z name, and that was it. He said have a good night.

ECF No. [45-2] at 92-93. The customer then paid the fee for the VIP room and proceeded to rape and violently assault Plaintiff in the VIP room. *Id.* at 94-95. After five minutes, the customer forcibly grabbed Plaintiff: "He had his hand like this and was tilting my head back as

far as he could, like as far as he could. And so I was yelling at him to stop." *Id.* at 97. Plaintiff

explained the harassment was facilitated by the failure of Defendant to offer the requisite safety

when she was in the VIP room:

> I just paid the dance track. So there was a man standing right there. And it's not a
> door that closes. There's a curtain over the opening of the room. So I would
> assume he was still there.
> It's—they're supposed to be there monitoring the rooms the entire duration of the
> stage. So either he left immediately after I went in that room, which he's not
> supposed to do so they're monitored the whole time, or he ignored it. There's no
> way he didn't hear.
> I was in the first room to the left. I was right here, so less than 10 feet away.

ECF No. [45-2] at 97-98. Further, Plaintiff asserts she was sexually assaulted twice on

the dance floor by another customer five days later, despite informing Defendant's employee

about the earlier assault. ECF Nos. [59] at 7, [45-2] at 129. Plaintiff asserts that Defendant's

employee did not remove the customer from the premises.

Plaintiff also testified to numerous observations that illicit prostitution was occurring on

the Club's premises. ECF No. [45-2] at 84-88. Plaintiff testified that she witnessed other

entertainers tip managers "thousands of dollars." *Id.* at 72. "I believe the girl and the manager

have an agreement where they both are making money off of the girl's actions with this customer

that the manager provides . . .." *Id.* at 72. "[T]here's no way that the girl can have a profit to still

tip $2,000 [to managers] if they're just doing the — with no further extras. There's no way." *Id.*

at 88. Further, Plaintiff witnessed comments indicating that entertainers were engaged in sexual

acts in the VIP rooms. *Id.* at 72.

There exists sufficient evidence to establish that Plaintiff was subjected to unwelcome

harassment at Defendant's Club — the second element of her hostile work environment claim. In

a summary judgment posture, the Court does "not weigh conflicting evidence or make credibility

determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate*, 839 F.3d at 1018.

### b.    Evidence the Club Knew or Should Have Known of the Incidents of Customer Misconduct

Defendant argues that Plaintiff's testimony regarding customer misconduct does not support a legal basis for the Club's liability or that the Club could have known those incidents occurred, and there is no evidence that the Club had notice of either incident. ECF No. [45] at 17-18. Defendant urges that the inquiry is whether "conduct that is so severe and pervasive as to confer constructive knowledge[,]" citing *Watson v. Blue Circle, Inc*. 324 F.3d 1252, 1260 (11th Cir. 2003), as two isolated and unreported incidents, no matter how disturbing the allegations may be, do not meet this standard. *Id.* at 18. Plaintiff responds the second and third prongs are satisfied as Defendant's business customers repeatedly subjected Plaintiff to extreme and violent instances of sexual assault, including rape by a customer introduced to her by a floor manager, ECF No. [58] at 22. Further, Plaintiff argues that Defendant failed to provide Plaintiff with adequate security. Despite Plaintiff and the customer only having been in the room for no more than five minutes, the Dance Track staff — whose station was no more than ten feet from her room — was nowhere to be found as Plaintiff screamed for help and as she exited the room. *Id.* at 23. Plaintiff states that on June 20, 2022, she was sexually assaulted on two separate occasions by the same customer, despite notifying Defendant of the first attack. *Id.* at 24. Defendant replies that Plaintiff does not offer any evidence as to the harassment by Club customers on June 15, 2022, or June 20, 2022. ECF No. [63] at 2-3. In her Surreply, Plaintiff contends that Defendant was aware of the clear and unequivocal risk presented by customers to entertainers, demonstrated by the fact that managers were trained and required to protect the safety of entertainers. ECF No. [73] at 7-8.

Defendant argues that Plaintiff cannot establish her *prima facie* case as to the fifth element of her hostile work environment claim "that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Mejdoub*, 2016 WL 4369968, at *8. First, "an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998). Second, "[i]t is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment." *Beckford v. Dep't of Corr.*, 605 F.3d 951, 957 (11th Cir. 2010). More specifically, "[a]n employer may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." *Watson*, 324 F.3d at 1258 n. 2.

> When, as in this case, the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action. *Breda*, 222 F.3d at 889. Actual notice is established by proof that management knew of the harassment. *Miller,* 277 F.3d at 1278. When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established. *Breda,* 222 F.3d at 889; *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364 (11th Cir. 1999). Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it. *Miller,* 277 F.3d at 1278.

*Id.* at 1259. Further, the Eleventh Circuit has explained that:

> direct liability exists when an employer knew *or upon reasonably diligent inquiry* should have known of the harassment and failed to take action. *See Faragher,* 111 F.3d at 1535. Our circuit thus places upon the employer an obligation to make reasonable efforts to know "what is going on" with respect to its own employees. Where there is no policy, or where there is an ineffective or incomplete policy, the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge. Where there exists an effective policy such as that

36

present in the instant action, however, we conclude that the employer has made reasonably diligent efforts to learn and know of the conduct of its employees.

*Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1553–54 (11th Cir. 1997).

### i. Vicarious Liability: Actual Notice and the Policy

Plaintiff does not argue that she complied with Defendant's policy. "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment *and* the complaining employee follows those procedures, actual notice is established." *Watson*, 324 F.3d at 1259 (emphasis added). Accordingly, the Court does not charge Defendant with actual notice based on Defendant having a clear policy and Plaintiff following the policy.

### ii. Vicarious Liability: Effective Policy

The Court accordingly addresses whether there is an effective policy of sexual harassment. "Where there exists an effective policy . . ., however, we conclude that the employer has made reasonably diligent efforts to learn and know of the conduct of its employees." *Farley*, 115 F.3d at 1553–54. The court held that "direct liability exists when an employer knew *or upon reasonably diligent inquiry* should have known of the harassment and failed to take action." *Id.* "[W]here there is an ineffective or incomplete policy, the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge." *Id.* at 1553–54.

Here, as in *Watson*, there is a genuine dispute of material fact as to whether Defendant "has an effective sexual harassment policy" so that Defendant could still be charged with constructive notice of harassment. *Watson*, 324 F.3d at 1260. Indeed, here, "unlike in *Farley,* the Title VII plaintiff has presented evidence to challenge the effectiveness of the company's sexual harassment policy." *Id*.

Defendant's policy states:

> We believe we should all work in an environment free from unwanted harassment. Sexual, racial, ethnic and other forms of harassment are forbidden by law and will not be tolerated.
> WE WILL NOT TOLERATE ANY FORM OF DISCRIMINATION OR HARASSMENT. Anyone who feels that he or she has witnesses, or been subject to, any form of discrimination or harassment is required to immediately notify management. We will promptly investigate any claim and take appropriate action. We will impose appropriate sanctions against any person found to be in violation of this policy. These sanctions may include, but are not limited to reprimand, suspension, demotion, transfer and discharge.

ECF No. [58-8] at 1. The form then lists policies as to the American with Disabilities Act, Retaliation and Confidentiality, which are two paragraphs each, and ends with an email, a number, and the disclaimer that "[V]iolations of this policy should immediately be reported to management." *Id.* Defendant's corporate representative also testified that:

> Tootsie's Cabaret Miami does not tolerate sexual assault or sexual harassment in any form. Employees are informed before the start of their employment of the policies regarding reporting incidents. Entertainers are informed by management to report any and all incidents of sexual harassment or sexual assault to one of the managers or other Club representatives. Once the managers have been informed of an incident, and if the incident occurs with a patron, the managers will ask the patron to leave the premises. If any employee, agent, or personnel affiliated with the clubs is found to have engaged in any sexual harassment or criminal conduct at all, he or she would be subject to disciplinary measures, including immediate termination. An incident report is then made and kept with the Club's records.

ECF No. [45-6] ¶ 4.

First, Plaintiff identifies deficiencies with the implementation of Defendant's policy which arguably render it ineffective. Plaintiff indicates that during the "sexual assault on June 20, 2022, as Plaintiff was dancing, the customer proceeded to forcibly insert his finger into Plaintiff's vagina without her consent." ECF No. [59] at 7. When Plaintiff first informed "the man working dance track during the lap dance" that a customer had touched her, he said "he would take care of it, and then he didn't. Because the man was still there." ECF No. [45-2] at

129. Indeed, later on that same evening, "[a]s she walked by, the customer instructed her to come over, at which time the customer again tried to forcibly grab her vagina." ECF No. [59] at 7.

That evidence raises a genuine dispute of material fact as to whether Defendant's policy was effective. As Defendant's corporate representative stated as to the policy, "[o]nce the managers have been informed of an incident, and if the incident occurs with a patron, the managers will ask the patron to leave the premises." ECF No. [45-6] ¶ 4. There is a question as to whether the man working the Dance Track informed a manager about the sexual assault, and whether the manager or another employee complied with the policy by asking the customer to leave the Club. Further, Plaintiff's testimony about raising the June 20, 2022 sexual assault with her manager raises additional concerns about the effectiveness of the policy. She testifies that after the second assault, she told a manager, which she believed to be Otero but whose name she is unsure of, that she was assaulted twice by a customer: "Otero, when I talked to him about the man who fingered me twice, he was not welcoming, at all. He was very hostile from then on forward." ECF No. [45-2] at 90.

Additionally, there is no evidence in the record demonstrating that the policy on sexual harassment was disseminated to employees or to Plaintiff. Lack of dissemination would hamper the policy's effectiveness. Plaintiff also identifies an issue as to the completeness of the policy. Defendant's policy lacks specificity or detail as to who and how to report sexual harassment. The policy merely indicates "Violations of this policy should immediately be reported to management. You can also email comments@rcimanagement.com or call (281) 397-6730." ECF No. [58-8] at 1. It does not indicate a specific manager to report to. Accordingly, Plaintiff raises an issue of material fact as to whether the policy was actually effective. "Under *Farley,* the employer's harassment policy must also be valid and *effective* in order to preclude a finding of

constructive notice." *Watson,* 324 F.3d at 1260 (emphasis added). The Court does not find that Defendant is entitled to summary judgment on the issue of notice due to the presence of a policy.

Indeed, Defendant could very well be liable despite having a policy. "[W]here there is an ineffective or incomplete policy, the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge." *Farley*, 115 F.3d at 1553–54.  There is no question that the conduct that occurred on Defendant's premises was "severe and pervasive" such that Defendant may be liable in the presence of an incomplete or ineffective policy. *Farley,* 115 F.3d at 1553–54. Plaintiff was introduced to a customer by Defendant's employee. Plaintiff testified the customer "picked me up and he threw me and I hit my head on the stone." ECF No. [45-2] at 101. The customer proceeded to rape her in the VIP room. *Id.* After that, Plaintiff "didn't have any bruises yet, but I had, like, marks, you know, and I had them really heavy in my arms and I had them a little bit on my neck or, like, on my jaw, I guess you could say. And I was, like, bleeding a little bit." *Id.* at 107. She also experienced vaginal bleeding. *Id.* at 108. The VIP rooms were not patrolled by security and a manager as was typical, ECF No. [73-1] at 61-62, and no one came to Plaintiff's rescue despite Plaintiff's screams. Five days later, she was assaulted twice by a customer who grabbed her vagina on the dance floor, and the customer was not asked to leave despite Plaintiff telling Defendant's employee about the first assault. ECF No. [45-2] at 90.

Defendant argues that the conduct is not "so severe and pervasive as to confer constructive knowledge[.]" *Farley*, 115 F.3d at 1553–54. The severe and pervasive "requirement . . . contains both an objective and a subjective component." *Miller*, 277 F.3d at 1276. "[T]o be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive" and an environment that the victim "subjectively perceive[s] . . .to be

abusive." *Id.* (internal quotation marks and citation omitted). Here, the record demonstrates the conduct Plaintiff allegedly endured was both subjectively perceived as abusive by Plaintiff, *see, e.g.,* ECF No. [45-2] at 109, and would result in an environment that a reasonable person would find hostile or abusive.

Defendant cites to *Wood* to argue that the behavior at issue is not severe and pervasive. Under *Wood*, "[n]o single factor is dispositive to the analysis. Courts are, therefore, mindful to consider the behavior in context, not merely as isolated acts, but to determine whether under the totality of the circumstances the harassment is sufficiently severe or pervasive, so as to alter the terms or conditions of a plaintiff's employment, and consequently create a hostile work environment." *Wood v. Kmart Corp.*, No. 05-60792-CIV, 2007 WL 9698301, at *6 (S.D. Fla. May 24, 2007), *aff'd sub nom. Wood v. K-Mart Corp.*, 273 F. App'x 806 (11th Cir. 2008).  In *Wood*, the Court found the actions at issue did not approach the level or harassment of those found in two out-of-circuit cases. In these cases:

> In *Turnbull v. Topeka St. Hosp.*, 255 F. 3d 1238 (10th Cir. 2001), after the plaintiff complained about the harassment she suffered from male patients at the hospital and repeatedly asked for greater security measures to be taken, she suffered an attack by a patient during which she was knocked to the ground, undressed, bitten, choked, and digitally raped by the patient. *Id.* at 1242-43. After the assault she suffered from post-traumatic stress disorder and could not return to work. *Id.* at 1242. In *Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998), the plaintiff, a waitress, complained on several prior occasions about harassment from certain patrons. Later, after objecting to waiting on the patrons, she was assaulted by both of them. The patrons pulled her hair, grabbed her breast, and one of the patrons put his mouth on her breast. Like the plaintiff in <u>Turnbull</u> she was also unable to return to work after the incident.

*Id.* at *6. Defendant attempts to distinguish *Turnbull* and *Lockhard* because "the third-party assaulted the plaintiff *after* plaintiff complained of their conduct and the defendant failed to take corrective action." ECF No. [45] at 18. The Court is unpersuaded. First, Defendant's representation is not entirely correct: in *Turnbull*, the plaintiff had "made no formal reports of

her safety concerns. She describes several conversations about safety with her supervisors in the psychology department" but was discouraged to file formal reports, and the case does not indicate that she had previously made a report as to the patient who assaulted her. *Turnbull.*, 255 F.3d at 1242.

Second, *Turnbull* and *Lockhard* did not consider whether conduct was "so severe and pervasive *as to confer constructive knowledge*." *Farley*, 115 F.3d at 1553–54 (emphasis added). Both cases asked if the conduct at issue was "sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment." *Turnbull*, 255 F.3d at 1243 (*Turnbull* occurred post-trial on a Rule 50 motion); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 (10th Cir. 1998). It would make little sense to require actual notice — so that the party has to complain about conduct and Defendant fails to take corrective action for Defendant to be liable — when asking if Defendant had *constructive* notice, as the Court does here. The Court declines to create a line that the courts in *Turnbull* and *Lockhard* — both out of circuit cases with similar fact patterns as this one — did not draw in the instant case. The line Defendant asks the Court to draw makes little sense in the constructive notice context.

Accordingly, there is a genuine dispute of material fact as to whether "there is an ineffective or incomplete policy" so that "the employer remains liable for conduct that is so severe and pervasive as to confer constructive knowledge." *Farley*, 115 F.3d at 1553–54.

### iv. Constructive Notice

Defendant argues that there are no facts to establish constructive knowledge of the first assault because Plaintiff's bruises were not visible, she never reported the assault, and never filed a police report. ECF No. [45] at 19-20.

"As a general rule, constructive notice of sexual harassment, when combined with a failure to act, is sufficient to impose direct liability on an employer based on the employer's own negligence 'when the harassment was so severe and pervasive that management reasonably should have known of it.'" *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 582 (11th Cir. 2007) (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir.2003)). Here the record establishes a genuine dispute of material fact as to whether the harassment is severe and pervasive enough to establish constructive notice by Defendant. Plaintiff testified that managers at the club arranged paid sexual encounters in the VIP rooms for entertainers, that one employee introduced her to an individual who raped her in the VIP room, while security or managers that typically patrolled were nowhere to be found. Just five days later, Plaintiff testified that another customer sexually assaulted her by grabbing her vagina not once but twice within the same evening, despite informing an employee of the first assault. Those events occurred over just ten days of Plaintiff performing at Defendant's Club. This may be considered "harassment . . .so severe and pervasive that management reasonably should have known of it'" such that Defendant can be found to have constructive notice. *Id.* at 582.

There is a genuine dispute of material fact whether Defendant had constructive knowledge of the conduct at issue such that Defendant may be held liable for the harassing conduct of its customers. There is a genuine dispute of material fact as to whether Defendant had constructive notice of the risk posed by customers to entertainers. Defendant appeared to train its managers and staff to patrol around the VIP rooms to ensure that entertainers would remain safe. As Hernandez testified, managers would spend "55 minutes on the floor, five minutes on the floor" as management "kind of instill in [managers]." ECF No. [73-1] at 21, 35. Hernandez testified that security in the VIP area looked as follows:

Q. Who's required to be in that room?
A. They're not in the room. They patrol the hallway.
Q. Sorry, I apologize. In the hallway or the general area, who's required to be in that area?
A. Whoever security is that day. And the entertainment manager always walks up and down and checks the rooms.
Q. Is there anyone else responsible for oversight of security in the general area or hallways of the VIP space?
A. The manager that's working the desk, if he has time he also walks up and down.
Q. The manager working the desk—I know we spoke earlier about entertainer managers, floor managers. Managers covering the desk in VIP, do they similar 55 to 5 rotation or are they in the VIP space the whole hour?
A. They don't have an office so they're constantly on the floor.
….
*Q. Is there a reason to have both the manager always present and security?*
*A. Safety.*
Q. Would you say that the entertainers are taking a risk when they're alone with a patron?
A. No.

ECF No. [73-1] at 61-62 (emphasis added). This raises a genuine dispute of material fact as to whether Defendant knew or should have known of the danger that was posed by customers to entertainers in the VIP room, which required constant patrolling and security.

Further, as to the June 20, 2022 assault, the record establishes that Plaintiff called over a Dance Track employee when a customer assaulted her on the dance floor. ECF No. [45-2] at 57-58, yet the individual who assaulted her was not expelled and tried to assault her a second time on the same evening. *Id.* at 61-62. There is a genuine dispute of material fact as to whether Defendant has actual or constructive notice as to that sexual assault and failed to take immediate and appropriate corrective action.

Accordingly, Defendant is not entitled to summary judgment on the issue of whether it "may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." *Watson*, 324 F.3d at 1258 n. 2.

### ii. *Faragher* Defense

Plaintiff urges that Defendant cannot raise a *Faragher* affirmative defense, as it never disseminated its policy to Plaintiff nor did the policy include any express detail other than "report to management." ECF No. [58] at 20. Defendant replies it is entitled to a *Faragher* affirmative defense as it published its sexual harassment policy to its employees, and Plaintiff never filed police or incident reports as to both events with Club customers, so there was no failure on the part of Defendant to take corrective action which could have prevented the complained of conduct. ECF No. [63] at 3-4.

"[A]n employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Faragher*, 524 U.S. at 780. A *Faragher* affirmative defense is established as follows:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.

*Id.* at 807. "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* at 808.

The Court finds that there is a genuine dispute of material fact that prevents summary judgment for Defendant's *Faragher* affirmative defense. First, Plaintiff has established a dispute

as to whether Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, as to the first element of the affirmative defense. After five minutes in the VIP room, the customer allegedly forcibly grabbed Plaintiff, and she was "yelling at him to stop." ECF No. [45-2] at 97. As Plaintiff explained, the customer paid the Dance Track person $350 before she entered the VIP room with the customer. *Id.* at 94.

> I just paid the dance track. So there was a man standing right there. And it's not a door that closes. There's a curtain over the opening of the room. So I would assume he was still there.
> It's—they're supposed to be there monitoring the rooms the entire duration of the stage. So either he left immediately after I went in that room, which he's not supposed to do so they're monitored the whole time, or he ignored it. There's no way he didn't hear.
> I was in the first room to the left. I was right here, so less than 10 feet away.

*Id.* at 97-98. Though both a manager and security were supposed to patrol the hallway of the VIP rooms according to Hernandez's testimony, no one intervened despite Plaintiff's screams while she was assaulted. *See* ECF No. [73-1] at 61-62. In doing so, Defendant plainly did not exercise "reasonable care to prevent and correct promptly any sexually harassing behavior[.]" *Faragher*, 524 U.S. at 807.

Further, there is a genuine dispute of material fact as to whether Defendant's anti-harassment policy demonstrates "reasonable care to prevent and correct promptly any sexually harassing behavior[,]" as indicated by the questions of fact discussed above as to whether the policy was disseminated to Defendant's employees and whether it was ineffective or incomplete. *Faragher*, 524 U.S. at 807.[4] Defendant is not entitled to summary judgment as to Defendant's

---

[4] Plaintiff argues that the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment" under the fourth element of Plaintiff's *prima facie* case. *Mejdoub*, No. 14-CIV-62722, 2016 WL 4369968, at *8. Defendant does not challenge that element of Plaintiff's *prima facie* case. As Defendant bears the burden to establish its entitlement to summary judgment, the Court does not reach those arguments.

affirmative defense. Defendant is not entitled to summary judgment as to Count I for hostile work environment.

## C. Retaliation under Title VII Claim: Count II

### 1.    Evidence of Protected Activity Under Title VII

Defendant argues that there is no evidence of any purported protected activity forming a Retaliation claim. ECF No. [45] at 23-24. Defendant urges that Plaintiff never reported the June 15, 2022 incident to anyone at the Club, there is no evidence that Plaintiff reported the June 20, 2022 incident because the manager she reported it to has not been an employee of the Club since 2011, and there are zero incident reports pertaining to Plaintiff. *Id.* at 21-22. Defendant urges there is no evidence of advances from Lopez, nor text messages, nor of a sex-for-cash scheme occurring at its Club. *Id.* at 23. Plaintiff fails to respond on this point. Defendant replies that because Plaintiff failed to respond, she did not meet her burden to provide sufficient evidence to support these claims as a matter of law. ECF No. [63] at 6. Plaintiff fails to respond to this argument in her Surreply.

"The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor." *L.S. by Hernandez v. Peterson*, 420 F. Supp. 3d 1307, 1314 (S.D. Fla. 2019) (citation omitted). "But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed." *Id.* (citing *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th

Cir. 2004)). Here, the Court is satisfied that the record supports that Plaintiff did not engage in a protected activity that then led to retaliation.

Accordingly, Defendant is entitled to summary judgment as to Plaintiff's Retaliation claim (Count II), the Retaliatory Hostile Work Environment claim under the FCRA (Count IV), and the Retaliatory Hostile Work Environment under the MDCO (Count VII).

<strong>2.      Evidence of a Causal Connection between the Alleged Protected Activity and the Alleged Adverse Employment Action</strong>

Defendant argues that Plaintiff fails to demonstrate that her alleged refusal of her manager's advances and/or her alleged reporting of misconduct are somehow related to her alleged constructive discharge. ECF No. [45] at 24-25. Defendant states the alleged failure to act could not have been the result of retaliating against protected activity because there is no evidence that the Club ever knew about the incidents occurring in the first place. *Id.* Plaintiff fails to respond on this point. Defendant replies that because Plaintiff failed to respond, she did not meet her burden to provide sufficient evidence to support these claims as a matter of law. ECF No. [63] at 6. Plaintiff does not respond to this argument in her Surreply.

"The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor." *L.S. by Hernandez*, 420 F. Supp. 3d at 1314 (citation omitted). "But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed." *Id.* (citations omitted). Here, the Court is satisfied that the record supports that there is no causal connection between her retaliation claim and the

alleged employment action, as Plaintiff did not return to work at the Club after reporting the June 20, 2022 assault to her manager. ECF Nos. [46] ¶ 2, [59] ¶ 2.

## D. Claims Under FCRA and MDCO: Counts II, V, VI, VIII

Defendant argues that Plaintiff's FCRA and MCDO claims fail as a matter of law for the same reasons detailed above, as the analysis under the FCRA and MCDO mirrors Title VII. ECF No. [45] at 25. Plaintiff does not respond to this argument. *See generally* ECF No. [58]. Defendant replies that because Plaintiff failed to respond, she did not meet her burden to provide sufficient evidence to support these claims as a matter of law. ECF No. [63] at 6.

To resist summary judgment, "[t]he non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor." *L.S. by Hernandez*, 420 F. Supp. 3d at 1314 (citation omitted). Plaintiff has failed to satisfy that burden to survive summary judgment here. "[E]ven where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed." *Id.* (citing *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla*., 363 F.3d 1099, 1103 n.6 (11th Cir. 2004)).

There is no reason for the Court to find a different result as to Plaintiff's claims under the FCRA and MDCO than the same claims brought under Title VII. For claims brought under the FCRA, Florida courts turn to decisions interpreting Title VII because the "Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *see also Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000). MDCO claims are

also interpreted accordingly to their federal counterparts. *See Telesca v. Vill. Of Kings Creek Condo. Ass'n, Inc.,* 390 F. App'x 877, 879 n.1 (11th Cir. 2010) (in the context of the Fair Housing Act).

Accordingly, Plaintiff's Gender Discrimination-Hostile Work Environment counts under the FCRA (Count II) and under the MDCO (Count VI) survive summary judgment, like Plaintiff's Gender Discrimination-Hostile Work Environment under Title VII claim (Count I) survives summary judgment. Further, Defendant is entitled to summary judgment as to Plaintiff's Retaliation claims under FCRA § 760.10(7) (Count V) and Plaintiff's Retaliation claim under MDCO (Count VIII), as Defendant was entitled to summary judgment as to Plaintiff's Retaliation under Title VII claim (Count II). Defendant does not seek summary judgment as to Plaintiff's Retaliatory Hostile Work Environment claims and is not entitled to summary judgment as to those claims. *See generally* ECF No. [45].

### E. TVPRA Claims: Counts IX and X

#### 1.     Elements of TVPRA Claim

Defendant argues that Plaintiff fails to establish the required elements of a TVPRA claim. ECF No. [45] at 26. Defendant states there is no evidence that Defendant knowingly benefitted from a sex trafficking venture; that Plaintiff herself admits she has no personal knowledge that commercial sex even occurred at the club; nor is there any evidence that Plaintiff engaged in a commercial sex act, that she did so by force, fraud, or coercion of Defendant, or that this occurred with respect to any other entertainers. *Id.* Plaintiff does not respond to this argument. *See generally* ECF No. [58]. Defendant replies that because Plaintiff failed to respond, she did not meet her burden to provide sufficient evidence to support these claims as a matter of law. ECF No. [63] at 6.

"The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021). The TVPRA creates a civil remedy for its violations in 18 U.S.C. § 1595(a):

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a). Under § 1591(a):

> (a) Whoever knowingly—(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a). Under the TVPRA, "a trafficking victim may sue a sex-trafficking perpetrator and 'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the Trafficking Victims Protection Act].'" *Doe #1*, 21 F.4th at 719 (citing 18 U.S.C. § 1595(a)).

To survive summary judgment on Count IX on whether Defendant engaged in sex trafficking by force or coercion under § 1591 and Count X on whether Defendant participated in a venture under 18 U.S.C § 1591, Plaintiff must establish a genuine dispute of material fact that Defendant "knowingly . . . benefits, financially or by receiving anything of value from

participation in a venture" described above. 18 U.S.C. § 1591(a)(2); *see also Doe #1*, 21 F.4th at 719. Plaintiff fails to point to evidence as to Counts IX and X in her Response and Surreply. To resist summary judgment, "[t]he non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor." *L.S. by Hernandez*, 420 F. Supp. 3d at 1314 (citation omitted). Plaintiff has failed to satisfy that burden to survive summary judgment here. "[E]ven where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed." *Id.* (citations omitted).

The record supports Defendant's facts here. Plaintiff testified that she witnessed other entertainers tip managers "thousands of dollars" for what she surmised were commercial sex acts. ECF No. [45-2] at 72. She testified: "I believe the girl and the manager have an [A]greement to where they both are making money off of the girl's actions with this customer that the manager provides . . .." *Id.* at 72. "[T]here's no way that the girl can have a profit to still tip $2,000 [to managers] if they're just doing the — with no further extras. There's no way." *Id.* at 88. Further, Plaintiff witnessed comments indicating that entertainers were engaged in sexual acts in the VIP rooms. *Id.* at 72. However, this is not evidence that Defendant itself "benefits, financially or by receiving anything of value" from participation in sex trafficking by force, fraud or coercion. 18 U.S.C. § 1591(a)(2). Viewing the evidence in the light most favorable to the Plaintiff, there is a lack of evidence that Defendant obtained this money so that it benefitted from the commercial sex act at issue, although some of its managers may have. Accordingly, the Court is satisfied that "all of the evidence on the record supports the uncontroverted material

facts that the movant has proposed," i.e., that Plaintiff has not established that Defendant benefitted from the sex trafficking witnessed by Plaintiff. *L.S. by Hernandez*, 420 F. Supp. at 1314.

Accordingly, Defendant is entitled to summary judgment as to Plaintiff's TVPRA counts, which are Counts IX for sex trafficking by force and/or Coercion and Count X for Participating in a Venture.

### F.   Negligence Claims

#### 1.       Negligence Claim: Count XI

Defendant states that it does not owe Plaintiff a duty as a matter of law. As to both the June 15, 2022, and June 20, 2022 incidents, there is no evidence that Defendant had notice of the wrongful conduct to stop it from occurring. ECF No. [45] at 27. Defendant argues there is no evidence that Defendant's conduct created a broader zone of risk. *Id.* Plaintiff responds that she has established a genuine issue of fact as to Defendant's negligence. ECF No. [58] at 27-28. Plaintiff urges Defendant owed her a duty as owners and/or operators of the premises and, separately, as a security provider for the premises. *Id.* at 28. Defendant responds that the harm in question was not foreseeable, so Defendant owed no duty to Plaintiff for all of Plaintiff's common law tort claims. ECF No. [63] at 5. In her Surreply, Plaintiff argues that Defendant's own actions established it knew the physical threat and risk of foreseeable harm to Plaintiff and all entertainers at the Club. ECF No. [73] at 8-9.

A claim for negligence requires "(1) a legal duty owed by defendant to plaintiff, (2) breach of that duty by defendant, (3) injury to plaintiff legally caused by defendant's breach, and (4) damages as a result of that injury." *Barnett v. Dep't. of Fin. Servs.*, 303 So. 3d 508, 513 (Fla. 2020). "The duty element of negligence focuses on whether the defendant's conduct foreseeably

created a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). But "a legal duty does not exist merely because the harm in question was foreseeable." *Aguila v. Hilton, Inc.,* 878 So. 2d 392, 396 (Fla. 1st DCA 2004). "Instead, the defendant's conduct must create the risk or control the situation before liability may be imposed." *Jordan v. Nienhuis*, 203 So. 3d 974, 978 (Fla. 5th DCA 2016). "There must also be some evidence that the risk was created by the alleged negligence of the defendant." *Aguila*, 878 So. 2d at 397. As the First District Court of Appeal clarified, "[t]he court used a form of the word 'create' several times to make the point that the foreseeable risk must be one that comes into being as a result of the defendant's act or omission." *Id.* at 397 n.2 (citing *McCain,* 593 So.2d at 502-03).

The Court first notes that "whether a duty arises 'from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged, which is a threshold question of law.'" *United States v. Stevens*, 994 So. 2d 1062, 1066–67 (Fla. 2008); *see also 10 Minute Fitness Inc. v. Amentum Servs., Inc.*, 679 F. Supp. 3d 1374, 1379 (S.D. Fla. 2023). The Court can therefore make the duty determination at the summary judgment stage.

While the Court acknowledges that entities such as Defendant do not generally have a duty to protect employees or their patrons from the criminal acts of a third party, the Court finds that, under the circumstances, Defendant, while in control of the club, was aware it created a foreseeable risk of sexual assault by having entertainers undress and perform highly sexualized activities for patrons in private VIP rooms. More importantly, Defendant assumed a duty to protect entertainers like Plaintiff from the foreseeable harm in the VIP rooms by stationing a manager and security guards to patrol the VIP hallway for safety. Additionally, since Defendant

was in control of the Club on June 20, 2022, it also had a duty to prevent the foreseeable risk of another assault of Plaintiff by a patron once Defendant allegedly was placed on notice that the patron had assaulted Plaintiff earlier that same evening. Accordingly, the Court finds that Defendant is not entitled to summary judgment on the negligence count because Defendant owed Plaintiff a duty under the circumstances regarding the June 15, 2022 and June 20, 2022 incidents.

As the district court in *Ademiluyi v. Nat'l Bar Ass'n* explained:

> "Generally, there is no duty to control the conduct of a third person to prevent [that person] from causing physical harm to another." *Carney v. Gambel*, 751 So. 2d 653, 654 (Fla. Dist. Ct. App. 1999). Relatedly, there is typically no duty "to take precautions to protect another against criminal acts of third parties." *Gross v. Family Servs. Agency, Inc.*, 716 So. 2d 337, 338 (Fla. Dist. Ct. App. 1998). There are, however, exceptions to this general rule. For example, a duty may arise when there is a special relationship between the defendant and the plaintiff, *Gross*, 716 So. 2d at 338, or if the defendant controls the instrumentality of the harm, the premises upon which the tort is committed, or the tortfeasor, *Daly v. Denny's, Inc.*, 694 So. 2d 775, 777 (Fla. Dist. Ct. App. 1997) (internal citation omitted).

No. 8:16-CV-2597-T-30AEP, 2017 WL 3022330, at *4 (M.D. Fla. July 17, 2017).

Plaintiff argues that Defendant has a duty as an operator of a bar/club (in the premises liability context), as well as a security provider for the premises. In the premises liability context, "for[e]seeability may be established by proving that a proprietor had actual or constructive knowledge of a particular assailant's inclination toward violence or by proving that the proprietor had actual or constructive knowledge of a dangerous condition on his premises that was likely to cause harm to a patron." *Hall v. Billy Jack's, Inc*., 458 So. 2d 760, 761 (Fla. 1984); *C.S. v. Inn of Naples Hotel, LLC*, 2021 U.S. Dist. LEXIS 93184, at *25 (M.D. Fla. May 17, 2021) (quoting *Banosmoreno v. Walgreen Co.*, 299 F. App'x 912, 913 (11th Cir. 2008)). "A dangerous condition may be indicated if, according to past experience (i.e., reputation of the tavern), there is a likelihood of disorderly conduct by third persons in general which might endanger the safety of patrons or if security staffing is inadequate." *Hall*, 458 So. 2d at 762.

Moreover, the Eleventh Circuit has held that 'the general likelihood of harm to the invitee, criminal activity in the vicinity, and security measures taken by the owner of the premises," are all relevant considerations in determining the foreseeability of the alleged harm. *Meyers v. Ramada Hotel Operating Co., Inc.*, 833 F.2d 1521, 1523 (11th Cir. 1987); *see also Holley v. Mt. Zion Terrace Apartments, Inc.*, 382 So.2d 98, 99–100 (Fla. 3d DCA 1980) (noting that the defendant's prior practice of providing armed guards constitutes an admissible indication of the defendant's own 'knowledge of the risk and the precautions necessary to meet it") (citations omitted).

Here, there is foreseeability such that Defendant, as the entity in control of Club, had a duty to Plaintiff. As to the June 20, 2022 assault, Defendant allegedly failed to expel the customer who assaulted Plaintiff on the dance floor after Defendant was notified of the first assault so it is entirely foreseeable that the same customer would assault Plaintiff once more. The record contains evidence that Defendant had knowledge of the second customer's dangerous propensities so that the assault was foreseeable. This is akin to *Goines v. Lee Mem'l Health Sys.*, No. 2:17-CV-656-FTM-29CM, 2019 WL 497706, at *10 (M.D. Fla. Feb. 8, 2019), which Plaintiff cites. In *Goines*, the court found that a hospital had a duty to protect a patient from reasonably foreseeable criminal acts committed on its property by its employees or third parties. There, the plaintiff was raped by a nurse, about whom the hospital had received a previous report of a sexual assault on a patient. That nurse had also previously been arrested for battery. The court held that "viewing the evidence in a light most favorable to plaintiff, the Court f[ound] the [previous sexual assault] incident and the battery arrest [were] sufficient to show Lee Memorial knew or should have known of [the nurse]'s dangerous propensities." *Id.* at *10. The court found that the nurse's "alleged sexual assault was reasonably foreseeable and Lee Memorial had a duty

to protect plaintiff from it." *Id.* at *10. Viewing the evidence in a light most favorable to Plaintiff, a Club employee had notice of the first assault against Plaintiff on June 20, 2022, such that the Club then had a duty toward Plaintiff as to the second assault that occurred with the same customer.

Additionally, the Court also finds that the alleged sexual assault of Plaintiff by a patron on June 15, 2022, was reasonably foreseeable to Defendant under the circumstances. Given the private nature of the VIP rooms, and Defendant's requirement that the entertainers undress and perform for individual patrons out of sight of any other individuals in the Club, Defendant created a unique opportunity or temptation for bad actors to take advantage of the situation and assault entertainers undetected. *See Knight v. Merhine*, 133 So. 3d 1140, 1148 (Fla. 1st DCA 2014) (outlining examples of affirmative acts sufficient to create a duty and sustain liability for the criminal acts of another such as '[w]here the [defendant] has brought into contact or association with the other a person whom the [defendant] knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct."). Not only was this risk of the sexual assault generally foreseeable, Plaintiff provided evidence that Defendant was aware of the particular risk that bad actors might use the privacy of the VIP rooms to assault entertainers. Defendant required that a manager and at least one individual responsible for security be stationed in the hallway outside the VIP rooms at all times and occasionally check inside the VIP rooms. ECF No. [73-1] at 61-62. The stated purpose of having both a manager and security in the VIP area was for the express purpose of "safety." ECF No. [73-1] at 61-62. The Court cannot conceive of any other safety risk in the VIP rooms, and Defendant has offered none, other than the risk of violent or unruly patrons assaulting entertainers, sexually or otherwise. Accordingly, the risk of

the alleged harm was reasonably foreseeable, and therefore, since Defendant had control of the premises, it had a duty to prevent such harm by third parties.

The Court's finding that Defendant had a duty to Plaintiff is further buttressed by the fact that a defendant who otherwise would not owe a duty may assume a duty by undertaking security measures to protect the plaintiff from harm. *See Robert-Blier v. Statewide Enterprises*, Inc., 890 So. 2d 522, 523 (Fla. 4th DCA 2005) ("A duty may arise from the general facts of a case when one undertakes to provide a service to others and 'thereby assumes a duty to act carefully and not to put others at an undue risk of harm.'") (quoting *Clay Elec. Coop., Inc. v. Johnson*, 873 So.2d 1182, 1185 (Fla.2003) and RESTATEMENT (SECOND) OF TORTSS § 324A (1965)); *Cf Paterson v. Deeb*, 472 So. 2d 1210, 1215 (Fla 3d. DCA 1985) (explaining that undertaking to provide security measures by contract, "having made representations concerning security" or "having abolished past security practices" that could have prevented criminal attacks could all potentially establish a duty to a plaintiff who was supposed to benefit from those security services).[5]  Under Florida law,

> One who undertakes gratuitous or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a)   His failure to exercise reasonable care increases the risk of such harm, or
> (b)   He has undertaken to perform a duty owed by the other to the third person, or
> (c)   The harm is suffered because of reliance of the other or the third person upon the undertaking.

*Clay Elec. Co-op., Inc v. Johnson*, 873 So. 2d 1182, 1186 (2003) (quoting Restatement (Second) of Torts § 324A (1965).

---

[5] The Court acknowledges that the *Paterson* case was decided within the landlord-tenant context; however, there is no reason why the undertaking of a duty analysis in that case would not be equally applicable here.

Here, Hernandez answered "safety" when asked "[i]s there a reason to have both the manager always present and security?" ECF No. [73-1] at 61-62. Defendant endeavored to "exercise reasonable care to prevent *any* criminal incident from occurring" against Plaintiff, and other similarly situated entertainers. *Vazquez v. Lago Grande Homeowners Ass'n*, 900 So. 2d 587, 593 (Fla. 3rd DCA 2004). Defendant assumed a particular duty to prevent criminal incidents from occurring on its premises, specifically in the VIP rooms. By failing to carry out this duty with reasonable care, i.e., not having security or a manger present while Plaintiff was in the room with a patron, Defendant increased the risk of harm to entertainers, especially those entertainers, like Plaintiff, who relied on Defendant's security measure to protect them from potential assaults by patrons. *See* ECF No. 45-2 at 98. Accordingly, Defendant is not entitled to summary judgment on the question of whether Defendant owed Plaintiff a duty and therefore, Plaintiff's negligence claim in Count IX survives summary judgment.

### 2.     Negligent Training Claim: Count XII

Defendant asserts it is entitled to summary judgment as to Plaintiff's Negligent Training claims as there is no evidence that any employee of the Club was unfit or that the Club should have taken corrective action. ECF No. [45] at 28. Defendant states the existence of a legal duty is also a threshold issue for a negligent training and supervising claim. *Id.* Plaintiff does not respond as to Defendant's argument on negligent training. *See generally* ECF No. [58]. Defendant does not comment on the lack of response. *See generally* ECF No. [63].

"The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor." *L.S. by Hernandez*, 420 F. Supp. 3d at 1314 (citation omitted). "But even where an opposing party

neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed." *Id.* (citations omitted). Here, the Court is satisfied that the record supports that Defendant is entitled to summary judgment on Defendant's Negligent Training claim. Although the Court has already determined that defendant owed a duty to Plaintiff, in order to establish a negligent training claim, a plaintiff must show that the defendant was "negligent in the implementation or operation of the training program." *Mercado v. City of Orlando*, 407 F.3e 1152, 1162 (11th Cir. 2005); *see Gutman v. Quest Diagnostic Clinical Laboratories, Inc.*, 707 F. Supp. 2d 1327, 1331 n. 4 (S.D. Fla. 2010). Here, there is no evidence in the record that defendant created a training program teaching managers and security personnel how to handle patrons who attempted to sexually assault or otherwise harm the Club's entertainers in the VIP rooms. Since there is no evidence that such a training existed, or any employee of the Club was unfit, Plaintiff cannot establish that Defendant negligently implemented a program or any employee was improperly trained. Accordingly, Defendant is entitled to summary judgment as to Count XII, Plaintiff's Negligent Training Claim.

### G.  Intentional Infliction of Emotional Distress: Count XIII

Defendant argues that Plaintiff's claim for Intentional Infliction of Emotional Distress fails as a matter of law because the Club did not engage in extreme or outrageous conduct. ECF No. [45] at 28. Plaintiff responds that she has established a genuine issue of fact as to Defendant's liability for Intentional Infliction of Emotional Distress, as Plaintiff endured some of the worst possible trauma. ECF No. [58] at 30. Plaintiff responds she was left abandoned after five minutes alone in the VIP room, despite the Dance Track station being no more than ten feet from the room and within screaming distance, as she was thrown across the room and raped,

which is outrageous enough to survive summary judgment on her intentional infliction of emotional distress claim. *Id.* at 30.

"In order to state a cause of action for intentional infliction of emotional distress, the plaintiff must demonstrate that: 1) the defendant acted recklessly or intentionally; 2) the defendant's conduct was extreme and outrageous; 3) the defendant's conduct caused the plaintiff's emotional distress; and 4) plaintiff's emotional distress was severe." *Johnson v. Thigpen*, 788 So. 2d 410, 412 (Fla. 1st DCA 2001) (citation omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (citation omitted). "Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2nd DCA 2007).

Defendant successfully establishes that there is no evidence in the record to support that Defendant intentionally inflicted emotional distress on Plaintiff. Though Plaintiff points to evidence as to Defendant's employees, the record does not support a finding that Defendant itself "acted recklessly or intentionally." *Johnson*, 788 So. 2d at 412. The standard for a finding of intentional infliction of emotional distress is high: "It is not enough that the intent is tortious or criminal; it is not enough that the defendant intended to inflict emotional distress; and it is not enough if the conduct was characterized by malice or aggravation which would entitle the plaintiff to punitive damages for another tort." *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1213 (Fla. 5th DCA 1995). Here, though one of Defendant's employees failed to exclude the customer who assaulted Plaintiff on June 20, 2022, and another failed to intervene to

protect Plaintiff when she was raped by a customer on June 15, 2022, the record does not support that Defendant intentionally caused the Plaintiff emotional distress.

Accordingly, Defendant is entitled to summary judgment as to Plaintiff's Intentional Infliction of Emotional Distress claim, Count XIII.[6]

**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment, **ECF No. [45]**, is **GRANTED IN PART** and **DENIED IN PART**.

2. Defendant is entitled to summary judgment on the following counts:

    a.  Retaliation under Title VII, 42 U.S.C. § 2000e-3(a) (Count II);

    b.  Retaliation under FCRA § 760.10(7) (Count V);

    c.  Retaliation under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VIII);

    d.  Retaliatory Hostile Work Environment under FCRA § 760.10(7) (Count IV);

    e.  Retaliatory Hostile Work Environment under MDCO, Chapter 11A, Article IV, Section 26(4) (Count VII);

    f.  Sex Trafficking by Force and/or Coercion under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 (Count IX);

    g.  Participating in a Venture under the TVPRA, 18 U.S.C. § 1591 (Count X);

    h.  Negligent Training (Count XII); and

---

[6] Defendant makes no specific argument on Plaintiff's Negligent Infliction of Emotional Distress, Count XIV. Plaintiff argues that it has established a genuine issue of fact as to Defendant's negligent infliction of emotional distress, and Plaintiff suffered undeniable physical and psychological trauma from Defendant's negligence. ECF No. [58] at 28-29. Defendant bears the burden to establish it is entitled to summary judgment and, because Defendant makes no argument as to this count, Defendant is not entitled to summary judgment on Plaintiff's Negligent Infliction of Emotional Distress count. Accordingly, the Court does not reach Plaintiff's arguments on this point.

Case No. 23-cv-23497-BLOOM/Torres

    i.   Intentional Infliction of Emotional Distress (Count XIII).

3.   Defendant is not entitled to summary judgment on:

    a.   Gender Discrimination-Hostile Work Environment under Title VII, 42 U.S.C. § 2000e-2(a) (Count I);

    b.   Gender Discrimination-Hostile Work Environment under the Florida Civil Rights Act ("FCRA") § 760.10(1)(a) (Count III);

    c.   Gender Discrimination-Hostile Work Environment under Miami-Dade County Code of Ordinances ("MDCO"), Chapter 11A, Article IV, Section 26(1) (Count VI); and

    d.   Negligence (Count XI).

4.   The following counts on which Defendant did not seek summary judgment will also proceed to trial:

    a.   Negligent Infliction of Emotional Distress (Count XIV); and

    b.   Vicarious Liability for Sexual Assault and Battery (Count XV).

**DONE AND ORDERED** in Chambers at Miami, Florida on January 13, 2025.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record